

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-12-1999

# Jacob Blinder & Sons v. Gerber Prod Co

Precedential or Non-Precedential:

Docket 97-5609

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

## Recommended Citation

"Jacob Blinder & Sons v. Gerber Prod Co" (1999). *1999 Decisions.* Paper 7.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/7

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 12, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos.: 97-5609 and 98-5125

In Re: Baby Food Antitrust Litigation

JACOB BLINDER & SONS, INC., WISEWAY SUPER FOOD
CENTER, INC., SUPER CENTER, INC., UNITED
BROTHERS FINER FOODS, INC., L. L. HARRIS
WHOLESALE GROCERY, PETER J. SCHMITT & CO., 3932
CHURCH STREET SUPERMARKET, INC., ARLEEN FOOD
PRODUCTS CO., INC., RUBIN BROOKS AND SONS, INC.,
        Appellants

(D.C. Civil No. 92-cv-05495)

JACOB BLINDER & SONS, INC., on behalf of itself and all
others similarly situated

v.

GERBER PRODUCTS COMPANY; H.J. HEINZ COMPANY;
RALSTON PURINA COMPANY; BNNC CORPORATION, (now
dissolved) fka BEECH-NUT-NUTRITION fka BEECH-NUT
FOODS CORPORATION (now dissolved) fka
BAKER/BEECH-NUT CORPORATION (now dissolved) BCN
CORPORATION, (now dissolved) fka BEECH-NUT
CORPORATION; NESTLE HOLDINGS, INC.;

(Newark New Jersey Civil No. 92-cv-05495)

PETER J. SCHMITT CO., on behalf of itself

v.

GERBER PRODUCTS COMPANY; H.J. HEINZ COMPANY;
RALSTON PURINA COMPANY; BNNC CORPORATION, (now
dissolved) aka BEECH-NUT-NUTRITION aka BEECH-NUT
FOODS CORPORATION (now dissolved) aka
BAKER/BEECH-NUT CORPORATION (now dissolved) BCN
CORPORATION, (now dissolved) aka BEECH-NUT
CORPORATION; NESTLE HOLDINGS, INC.;

(Newark New Jersey Civil No. 93-cv-00047)

WISEWAY SUPER FOOD CENTER, INC., on behalf of itself
and all others similarly situated

v.

GERBER PRODUCTS COMPANY; H.J. HEINZ COMPANY;
RALSTON PURINA COMPANY; BNNC CORPORATION, (now
dissolved) aka BEECH-NUT-NUTRITION aka BEECH-NUT
FOODS CORPORATION (now dissolved) aka
BAKER/BEECH-NUT CORPORATION (now dissolved) BCN
CORPORATION, (now dissolved) aka BEECH-NUT
CORPORATION; NESTLE HOLDINGS, INC.;

(Newark New Jersey Civil No. 93-cv-00048)

SUPER CENTER, INC., on behalf of itself and all others
similarly situated

v.

GERBER PRODUCTS COMPANY; H.J. HEINZ COMPANY;
RALSTON PURINA COMPANY; BNNC CORPORATION, (now
dissolved) aka BEECH-NUT-NUTRITION aka BEECH-NUT
FOODS CORPORATION (now dissolved) aka
BAKER/BEECH-NUT CORPORATION (now dissolved) BCN
CORPORATION, (now dissolved) aka BEECH-NUT
CORPORATION; NESTLE HOLDINGS, INC.;

(Newark New Jersey Civil No. 93-cv-00049)

UNITED BROTHERS FINER FOODS, INC., on behalf of
itself and all others similarly situated

v.

GERBER PRODUCTS COMPANY; H.J. HEINZ COMPANY;
RALSTON PURINA COMPANY; BNNC CORPORATION, (now
dissolved) aka BEECH-NUT-NUTRITION aka BEECH-NUT
FOODS CORPORATION (now dissolved) aka
BAKER/BEECH-NUT CORPORATION (now dissolved) BCN
CORPORATION, (now dissolved) aka BEECH-NUT
CORPORATION; NESTLE HOLDINGS, INC.;

(Newark New Jersey Civil No. 93-cv-00050)

L. L. HARRIS WHOLESALE GROCERY, a partnership, on

2

behalf of itself and all others similarly situated

v.

GERBER PRODUCTS COMPANY; H.J. HEINZ COMPANY;
RALSTON PURINA COMPANY; BNNC CORPORATION, (now
dissolved) aka BEECH-NUT-NUTRITION CORPORATION
(now dissolved) aka BEECH-NUT FOODS CORPORATION
(now dissolved) aka BAKER/BEECH-NUT CORPORATION
(now dissolved) BNC CORPORATION, aka BEECH-NUT
CORPORATION; (now dissolved); NESTLE
HOLDINGS, INC.;

(Newark New Jersey Civil No. 93-cv-00051)

3932 CHURCH STREET SUPERMARKET, INC., an Illinois
Corporation, on behalf of itself and all others similarly situated

v.

GERBER PRODUCTS COMPANY; H.J. HEINZ COMPANY;
RALSTON PURINA COMPANY; BNNC CORPORATION,
(formerly known successively as Baker/Beech-Nut
Corporation, Beech Nut Foods Corporation, and Beech
Nut Nutrition Corporation) (now dissolved); BNC
CORPORATION, (formerly known as Beech-Nut
Corporation) (now dissolved); NESTLE HOLDINGS, INC.;

(Newark New Jersey Civil No. 93-cv-0320)

ARLEEN FOOD PRODUCTS CO., INC., on behalf of itself
and all others similarly situated

v.

GERBER PRODUCTS COMPANY; H.J. HEINZ COMPANY;
RALSTON PURINA COMPANY; BNNC CORPORATION,
(formerly known successively as Baker/Beech-Nut
Corporation, Beech-Nut Foods Corporation, and Beech-
Nut Nutrition Corporation) (now dissolved) BNC
CORPORATION, (formerly known as Beech-Nut
Corporation) (now dissolved); NESTLE HOLDINGS, INC.;

(Newark New Jersey Civil No. 93-cv-0407)

RUBIN BROOKS AND SONS, INC., on behalf of himself
and all others similarly situated

v.

3

GERBER PRODUCTS COMPANY; H.J. HEINZ COMPANY;
RALSTON PURINA COMPANY; BNNC CORPORATION,
(formerly known successively as Baker/Beech-Nut
Corporation, Beech-Nut Foods Corporation and Beech-Nut
Nutrition Corporation) (now dissolved); BNC
CORPORATION, (formerly known as Beech-Nut
Corporation (now dissolved); NESTLE HOLDINGS, INC.

(Newark New Jersey Civil No. 93-cv-00802)

Jacob Blinder & Sons, Inc., Wiseway Super Food Center,
Inc., Super Center, Inc., United Brothers Finer Foods,
Inc., L. L. Harris Wholesale Grocery, Peter J. Schmitt &
Co., 3932 Church Street Supermarket, Inc., Arleen Food
Products Co., Inc., Rubin Brooks and Sons, Inc.,
        Appellants in No. 98-5125

Appeal for the United States District Court
For the District of New Jersey
D.C. Nos.: 92-cv-05495, 93-cv-00047, 93-cv-00048,
93-cv-00049, 93-cv-00050, 93-cv-00051,
93-cv-00320, 93-cv-00407
District Judge: Honorable Nicholas H. Politan

Argued: October 1, 1998

Before: BECKER, Chief Judge, ROSENN, Circuit Judge and
KATZ, District Judge*

(Filed January 12, 1999)

*The Honorable Marvin Katz, District Judge, Eastern District of
Pennsylvania, sitting by designation.

4

Michael J. Freed, Esquire
Much, Shelist, Freed, Denenberg,
Ament, Bell & Rubenstein
200 North Lasalle Street, Suite 2100
Chicago, IL 60601
 and
Joel C. Meredith, Esquire
Daniel B. Allanoff, Esquire
Meredith, Cohen, Greenfogel &
 Skirnick
117 South 17th Street, 22nd Floor
Philadelphia, PA 19103
 and
Joseph J. De Palma, Esquire
Allyn Z. Lite, Esquire
Goldstein, Lite & De Palma
Two Gateway Center, 12th Floor
Newark, NJ 07102
 and
Perry Goldberg, Esquire
Granvil I. Specks, Esquire
Specks & Goldberg
10 South Wacker Drive, Suite 3500
 and
Dianne M. Nast, Esquire
Roda & Nast
801 Estelle Drive
Lancaster, PA 18702
 and
Robert A. Skirnick, Esquire (Argued)
Meredith, Cohen, Greenfogel &
 Skirnick
63 Wall Street, 32nd Floor
New York, NY 10005

 Counsel for Appellants

Arnold B. Calmann, Esquire
Saiber, Schlesinger, Satz &
 Goldstein
One Gateway Center, Suite 1300
Newark, NJ 07102

and
Joseph A. Tate, Esquire (Argued)
Judy L. Leone, Esquire
George G. Gordon, Esquire
Dechert, Price & Rhoads
1717 Arch Street
4000 Bell Atlantic Tower
Philadelphia, PA 19103

 Counsel for Appellee Gerber
 Product Company

Edward P. Henneberry, Esquire
 (Argued)
Keith E. Pugh, Jr., Esquire
Robert L. Green, Jr, Esquire
Ellen S. Winter, Esquire
Howrey & Simon
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
 and
Matthew P. Boylan, Esquire
Lowenstein Sandler, Esquire
65 Livingston Avenue
Roseland, NJ 07068

 Counsel for Appellee HJ Heinz
 Company

Mary E. Kohart, Esquire (Argued)
Patrick T. Ryan, Esquire
Patricia Proctor, Esquire
Drinker, Biddle & Reath
1345 Chestnut Street
Philadelphia National Bank Building
Philadelphia, PA 19107

 Counsel for Appellee Ralston
 Purina Company

          Terrence C. Sheehy, Esquire
           (Argued)
          Howrey & Simon
          1299 Pennsylvania Avenue, N.W.
          Washington, DC 20004

           Counsel for Appellees BNNC
           Corporation; BCN Corporation;
           and Nestle Holdings, Inc.

OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal, relating to a highly concentrated nationwide industry, raises interesting questions of proof and law in a hotly-contested antitrust action. The plaintiffs, direct purchasers of baby food from defendant manufacturers, include wholesalers, supermarket chains, and other direct purchasers. The defendants, nationally prominent corporations, are Gerber Products Company ("Gerber"), H.J. Heinz Co. ("Heinz"), Nestle Food Company/Beech-Nut ("Nestle/Beech-Nut") and Ralston Purina Company/Beech-Nut ("Ralston/Beech-Nut") (collectively "Beech-Nut").[1] Collectively, they account for over 98% of all baby food products manufactured and sold in the United States.

The plaintiffs are Jacob Blinder & Sons, Inc., Wiseway Super Food Center, Inc., Super Center, Inc., United Brothers Finer Foods, Inc., L.L. Harris Wholesale Grocery, Peter J. Schmitt & Co., 3932 Church Street Supermarket, Inc., Arleen Food Products Co., Inc., and Rubin Brooks and Sons, Inc. They brought this anti-trust class action against the defendant manufacturers under SS 4 and 6 of the Clayton Act, 15 U.S.C. SS 15 and 26, in the United States District Court for the District of New Jersey. They allege that beginning in early 1975 and continuing until

_____

1. Before 1989, Beech-Nut was owned by Nestle Food Co. In November 1989, Ralston Purina purchased Beech-Nut from Nestle. Therefore, the four defendants are actually Heinz, Gerber, Nestle/Beech-Nut, and Ralston/Beech-Nut.

7

December 31, 1993,[2] the defendants engaged in an unlawful conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. S 1) to fix, raise, and maintain wholesale prices and price levels of baby food in the United States resulting in injury and damage to the plaintiffs.

At the conclusion of discovery, each defendant filed a motion for summary judgment. The District Court granted the motion in favor of all defendants. The clerk taxed costs in favor of the defendants and that court affirmed the award of costs.

Defendants timely appealed from both orders to this court. We affirm.

I.

Background

Gerber, although the smallest of the defendant corporations, is the nation's largest manufacturer of baby food products and accounts for approximately 70% of the total market in the United States. Heinz and Beech-Nut share almost equally the balance of the market. Gerber manufactures and sells approximately 200 different baby food products; Heinz follows closely with 165 and Beech-Nut with approximately 140. Collectively, they sell slightly more than 500 baby food products grouped into five broad categories: First Food, Second Foods, Third Foods, Cereals, and Juices. Together, they provide much of the nutrition for most of the nation's infant population.

Through the pricing of their products, each defendant has sought to differentiate itself and carve out a company niche in the marketplace. Gerber is the undisputed market leader and premium brand, selling its products nationwide and focusing only on baby food. Heinz is the "value" brand, consistently adopting strategies to maintain a significant price spread between itself and Gerber. Heinz has had a strong presence in the central Midwestern and

_____

2. The District Court certified the action as a class for the period beginning January 1, 1989, and ending December 31, 1992.

Southwestern parts of the country. Beech-Nut, initially positioned as a low-priced brand, underwent a struggle from 1985 through 1989 under Nestle ownership to become a premium brand with prices higher than Gerber's. In 1989, when Ralston acquired Beech-Nut from Nestle, Ralston decided to elevate its price structure to be competitive with Gerber's. Beech-Nut traditionally has had a strong presence in New England, New York, and Eastern Pennsylvania.

Many retailers have come to carry only two brands of baby food. Gerber is almost always one of the two. Significantly, each company has two pricing levels: the list price and the transaction price. The list price, the price officially announced by the company, is used as a base price from which customer discounts and allowances are deducted to obtain the transaction price. The transaction price is the price at which the wholesalers and supermarket chains actually buy the baby food; the price takes into account discounts, bulk-purchasing, rebates, regional considerations, and special promotions. The manufacturers, however, do not offer discounts across the board; at any given time, one customer may pay a different price than the next customer for the same product. Heinz claims that it sells more than 80% of its baby food at prices below list. In addition, Heinz and Beech-Nut do not implement uniform national price increases, often delaying increases in particular geographic regions.

The plaintiffs' foremost allegation is that the defendants exchanged information with each other regarding future price increases before announcing any increases to the public. Plaintiffs maintain that the defendants had no legitimate business reason for informing each other of price increases before publicly announcing them except for their motivation to conspire. The plaintiffs allege that Gerber, the dominant company in the industry and the price leader, would decide to raise its prices and, if the other two competitors did not follow the price increase immediately, the time-gap between Gerber's price increase and the increases of the other companies would be of sufficient length to disturb their respective market shares. Therefore, giving advance notice solved this problem. The plaintiffs

9

claim that because advance notice did occur, this evidences that an agreement economically to conspire among the defendants was in place.

Following exhaustive discovery over a period of three years, the District Court granted summary judgment for all defendants on the ground that plaintiffs' case was "sorely lacking" in any evidence pointing to an agreement among the defendants to fix prices. The plaintiffs timely appealed.

II.

The Underlying Legal Concepts

The legal fulcrum for the plaintiffs' complaint is Section 1 of the Sherman Act. Section 1 provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. S 1. The existence of an agreement is the hallmark of a Section 1 claim. Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 999 (3d Cir. 1994). Liability is necessarily based on some form of "concerted action." Id.[3] Indeed, we have defined a conspiracy as a "conscious commitment to a common scheme designed to achieve an unlawful objective." Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 111 (3d Cir. 1980). In other words, " `unity of purpose or a common design and understanding or a meeting of the minds in an unlawful arrangement' must exist to trigger Section 1 liability." Alvord-Polk, 37 F.3d at 999, (quoting Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984)).

In determining whether certain concerted action amounts to an unreasonable restraint this court applies one of two methods of analysis. See e.g. Rossi v. Standard Roofing, 156 F.3d 452, 461 (3d Cir. 1998). The concerted action is either analyzed (1) through the per se sta ndard, which

_____

3. The phrase "concerted action" is often used as shorthand for any form of activity meeting the Section 1 " `contract . . . combination or conspiracy' requirement." Bogosian v. Gulf Oil Corp., 561 F.2d 434, 445-46 (3d Cir. 1977) quoting L. Sullivan, Law of Anti-Trusts, p. 312 (1977).

10

presumes that the questionable conduct has anti-competitive effects without comprehensive inquiry into whether the concerted action produced adverse, anti-competitive effects, or (2) through the so-called rule of reason, a case-by-case method that involves consideration of all of the circumstances of a case to decide whether certain concerted action should be prohibited because it amounts to an anti-competitive practice. The analysis to be applied depends on the essence of concerted action in dispute. Id.

Generally, price-fixing agreements are considered a per se violation of the Sherman Act. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218 (1940). Per se violations include those types of restraints on competition that are in and of themselves considered unreasonable because "their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable." United States v. Cargo Service Stations, Inc., 657 F.2d 676, 682 n.4 (5th Cir. Unit B 1981) (quoting Northern Pacific Ref. v. United States, 356 U.S. 1, 5 (1958)). However, when the evidence consists of mere exchanges of information the presumption vanishes. See United States v. United States Gypsum Co., 438 U.S. 422, 441 n.16 (1978). Exchanges of information are not considered a per se violation because "such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." Gypsum, Id. at 441 n.16. Therefore, such exchanges of information are evaluated under a rule of reason analysis.

This court has previously articulated what Section 1 rule of reason analysis entails. We laid down four steps of proof that a plaintiff must present: (1) that the defend ants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced ad verse anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and co nduct pursuant to the contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximat e result of that conspiracy. J.F. Fesser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1541 (3d Cir. 1990).4 Under the rule of reason,

_____

4. The District Court disposed of plaintiffs' case under the first prong of
Fesser; it did not reach prongs (2), (3), and (4). Only Nestle questioned

all the evidence presented must be weighed to determine whether the defendants' purported price fixing practices violated the Sherman Act.

III.

The Evidence

Although there are some subordinate questions, the instant case stands or falls on the question whether the plaintiffs produced sufficient probative evidence to meet the demanding standard of proof required in the context of an antitrust case. Accordingly, we turn to an analysis of the voluminous evidence introduced by the plaintiffs.

The plaintiffs have produced extensive circumstantial evidence, but claim that their direct evidence sufficiently proves a price-fixing conspiracy. They spiritedly claim that their direct evidence of reciprocal price exchanges and a collusive truce is sufficient to support a Section 1 conspiracy claim. Direct evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted. As we noted recently in Rossi, with direct evidence "the fact finder is not required to make inferences to establish facts." 156 F.3d at 466.

The plaintiffs heavily rely on the deposition testimony of Brian Anderson, formerly employed by Heinz as a sales representative until 1986, and Marshall Gibbs, formerly employed by Heinz as a district sales manager until 1984. Their testimony reveals that they were required to submit competitive activity reports to their superiors concerning baby food sales from information they picked up from competitor sales representatives. The information they obtained was verbal and usually passed on orally to their superiors. There was no organized system to secure the

_____

whether the defendants provided sufficient proof of fact of injury and damages under prong (4). Because the District Court did not address and the defendants did not argue that plaintiffs' evidence fell short with respect to prongs (2) and (3), we do not consider them.

12

information; it was obtained sporadically, verbally, and informally in conversations among the representatives. Anderson testified that his supervisor, Area Manager Fred Runk, informed him on a regular basis before any announcement to the trade as to when Heinz's competitors were going to increase the wholesale list prices of their baby food products. Anderson also testified that he exchanged future price information with various sales representatives of Beech-Nut and Gerber as to whether Heinz, Beech-Nut, and Gerber were planning to announce future price increases. Moreover, according to Anderson, such exchanges between sales representatives were common in the baby food industry.

Gibbs similarly testified that he personally exchanged pricing information with sales representatives of the other companies. Specifically, Gibbs stated "[I] would, obviously, get with another rep., and say, you can give me and I can give you and we can pat each other on the back and get this information in because we both have the same accountability." Beech-Nut also required its sales representatives to gather competitive information. In their depositions, Neils Hoyvald, President of Beech-Nut prior to 1988, and James Nichols, who succeeded Hoyvald, testified that it was company policy for sales representatives to gather and report pricing information of their competitors.

On September 1, 1986, Gerber's New York Division Manager, Don Beaudoin, sent a competitive price change and activity report to Gerber's Regional Manager for the Eastern Region and Vice President of Sales. Attached to the report was an unsigned Beech-Nut announcement of a forthcoming September 29, 1986 price increase. Beech-Nut executives admitted that Gerber appears to have had possession of the September 29 price increase announcement as early as September 1, 1986, but claim ignorance as to how Gerber obtained the document.

Beech-Nut obtained advance notice of a February 13, 1989 Gerber price increase at least a week before it was announced to the trade. Each page of the memorandum was stamped "HIGHLY CONFIDENTIAL." The memorandum instructed the division managers not to notify their accounts of the price increase until February 13, 1989, the

13

effective date of the increase. Gerber did not notify the trade of the price increase until February 13, 1989, yet Beech-Nut knew of the increase at least as early as February 6, 1989.

Gerber had advance knowledge of a May 1, 1989 Beech-Nut price increase at least a day before it was announced to the trade. A March 31, 1989 memorandum from Norman Knorr of Gerber confirms this by describing a March 27 conference call between Gerber's Al Gorsky, Vice President of Sales, and Gerber's regional managers. The memorandum stated in part: "We received a report from the Boston Division that a [Beech-Nut] price increase will be in effect on May 1. Details were telexed to the field."

Beech-Nut had advance knowledge of a planned February 1990 Gerber list price increase as early as two months and no less than eight days before its announcement to the trade on December 28, 1989. In an October 13, 1989 memorandum to Theuer, Joseph Gaeto, Vice President of Marketing of Beech-Nut, wrote, "I strongly suspect that Gerber will increase their prices on Friday, March 2, 1990." In a December 20, 1989, memorandum to Beech-Nut's regional and zone managers, Humbarger (Beech-Nut's Operation Manager in New York) stated "We have heard very strong rumors that Gerber will most likely increase their base price in February, 1990."5

In a competitive activity report one week before Beech-Nut's announcement on November 27, 1991, of a list price increase that excluded the West Coast, Dick Grainger, Gerber's Los Angeles District Manager, reported to Jerri Jean Wilson, Gerber Director of Field Communications, a "[r]umor that Beech-Nut will not advance prices for at least three months [on the West Coast]." The same day, Grainger also sent a report to Gerber's Vice-President, Al Gorsky,

---

5. Plaintiffs assert that in the baby food industry a communication from a competitor is referred to as "rumor," a term of art. This characterization is attributed to an exchange between plaintiffs' counsel and Jerri Jean Wilson, Gerber's Director of Field Communications, during her deposition, where she stated that "rumor" means chit-chat that occurs among employees of the defendants on "the street."

that advised "Beech-Nut has no plans for a price increase within the next three months."

A September 25, 1992, e-mail from Beech-Nut's Bob Butcher related the details of a conversation between Beech-Nut's District Manager Joe Piscola and Frank Garritano of Gerber, in which Piscola told Garritano that Beech-Nut would not be taking "a price increase at this time." A handwritten note on the Gerber e-mail printout stated, "Keep me advised on any price increases by competition! We will be in a world of hurt if Heinz/Beech-Nut does not increase." Al Gorsky, among others at Gerber, received copies of this document. James Nichols, President of Beech-Nut, also testified that at least two to three times a year Mick Humbarger would inform him of conversations between Beech-Nut and Gerber personnel in metropolitan New York.

Plaintiffs also point to a varied assortment of documents and memoranda they introduced into evidence, the most significant of which are: (1) A September 1, 198 6 Gerber memorandum which plaintiffs assert proves that Gerber had advance knowledge of a September 29, 1986 Beech-Nut list price increase on all of its products. Notice of the increase was not officially sent to the Beech-Nut brokers and sales force for announcement to the trade until September 4, 1986. (2) A February 6, 1989, letter from Nestle's President, Theuer, to the Chairman of his Board notifying him that "[w]e have unconfirmed news from the trade that on February 13, Gerber will increase prices." On February 10, Theuer wrote that "it is confirmed that Gerber will increase prices on February 13, 1989." Theuer testified that he assumes that he received this information from the trade, in light of his language in the February 6 memo. (3) Plaintiffs' remaining examples show that Gerber knew of a Beech-Nut price increase one day before it was announced.

In addition, plaintiffs point to defendants' expert Dr. William C. Myslinski's testimony that "when two defendants . . . get together and they mutually exchange information" and "indicate to each other what they are going to charge in the future," such conduct "would be consistent with a conspiracy." In addition, they highlight the defendants'

15

failure to explain how Gerber knew of the September 4, 1986 price increase three days early, when Beech-Nut's sales force and customers were not told of the increase until September 4.

Furthermore, the plaintiffs submitted evidence of a 1984 Heinz communication from Gerber's area manager, Ron Coble, to his superior, Terry Ryan. The background for Coble's communications, the plaintiffs claim, was an important shift in the early 1980s in the baby food industry. Baby food distributors realized that it was no longer economically beneficial to stock each of the defendants' products. They decided to turn to a "two-brand" system and stock the market leader, Gerber, and either Heinz or Beech-Nut. Coble's memorandum to Ryan stated:

> In Nov. 1983, I was told by MDI management [a prospective Heinz customer] that they wanted to stock only two brands of baby food -- Gerber and someone else. Their main objective was to stock the lines that were preferred by the retailers. I advised them that we would make every effort to secure a majority base of distribution. However, with our "truce" in effect, I knew our hands were tied.

The plaintiffs regard this memorandum as significant direct evidence of price-fixing. At his deposition, Coble testified that he did not recall why he used the word "truce," but believed that it referred to the Heinz Marketing Department. They, he stated, made the policies "based on costs" as to the territories where the company was to do business.

The plaintiffs hypothesize that in the early 80s, changes in consumers' purchasing practices caused a change in the wholesalers' market strategy that "provoked a new market dynamic characterized by a price struggle between Heinz and Beech-Nut for the second brand position, a struggle in which Gerber was forced to join in order to preserve its own market share." Although this episode does not appear to relate to price-fixing but to unfair competition, the plaintiffs argue that the "truce" had the effect and purpose of enabling the defendants to fix prices.

The plaintiffs assert that their version of the "truce" is supported by statements and correspondence from other

16

Heinz employees. For instance, the plaintiffs note that Tim Senft, Heinz's Manager of Sales Planning, explained to a subordinate that "[t]he days of 3/store are gone – B/N's [Beech-Nut's] move to Stages[6] nationally should abate the war. We don't want it to start again."

Furthermore, the plaintiffs contend that the impact of the "truce" on the level of competition is evidenced by (1) a letter from Neils L. Hoyvald, President of Beech-Nut, to James Biggar, Chairman of Nestle Enterprises, Inc., in which he states that they were able to accomplish"[t]he elimination of all competitive counter offers, which was stopped late 1983 and the situation has held, with Heinz following our initiative";7 (2) a 1984 internal Heinz memorandum from Holscher and Haviland requesting extension of an allowance on strained food in the Florida district, which contained a statement that Heinz lost distribution in fiscal year 1983 in Miami "and since Heinz has taken the position that we do not want to [pursue] the business in Miami," a Beech-Nut market App. at 1739; and (3) a note to a 1985 Heinz memorandum from Senft t o Costello stating: "There are people who think . .. [that Heinz's] . . . previous attempts to gain distribution in Miami . . . started the last `Tet Offensive.' "

To boost their claim that the 1984 "truce" in price competition existed, plaintiffs point to the absence of any list price increases for the two and one half years preceding the "truce," but note that after it became effective, list prices increased at least once a year. Plaintiffs also claim that Heinz's refusal to enter the Chicago market demonstrated the truce's success.

We have reviewed the documentary evidence and the testimony of Anderson and Gibbs and we conclude that they do not make out a case of direct evidence. The plaintiffs here have been unable to present evidence of conspiracy to fix prices without drawing on inferences from all of the evidence they have introduced. The direct

_____

6. According to plaintiffs, "Stages" marked the beginning of Beech-Nut's effort to displace Gerber as the premium price brand of baby food and end its competition with Heinz for the more price sensitive consumer.

7. At the time, Beech-Nut was owned by Nestle.

17

evidence evinces only an exchange of information among the defendants. Accordingly, we apply the rule of reason. Amey, 758 F.2d at 1505.

We, therefore, turn to the parallel pricing evidence on which the plaintiffs also rely to prove joint collaborative action.

IV.

Parallel Pricing

In the absence of direct evidence, the plaintiffs may nevertheless support their claim with circumstantial evidence of conscious parallelism. Weit v. Continental Illinois National Bank & Trust Company, 641 F.2d 457, 462 (7th Cir. 1981). Conscious parallelism, sometimes called oligopolistic price coordination, is described as the process "not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a prefixed maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions." Brooke Group, 509 U.S. 209, 227 (1993). The theory of conscious parallelism is that uniform conduct of pricing by competitors permits a court to infer the existence of a conspiracy between those competitors. Todorov v. DCH Healthcare Authority, 921 F.2d 1438, 1456 n.30 (11th Cir. 1991). The theory is generally applied to highly concentrated markets where few sellers exist and where they establish their prices, not by express agreement, but rather in a consciously parallel fashion. Shapiro v. General Motors, 472 F. Supp. 636, 647 (D.Md. 1979). Thus, when two or more competitors in such a market act separately but in parallel fashion in their pricing decisions, this may provide probative evidence of the existence of an understanding by the competitors to fix prices. Todorov, 921 F.2d at 1456 n.30.

In an oligopolistic market, meaning a market where there are few sellers, interdependent parallelism can be a necessary fact of life but be the result of independent pricing decisions.

18

> [I]n a market served by three large companies, each firm must know that if it reduces its price and increases its sales at the expense of its rivals, they will notice the sales loss, identify the cause, and probably respond. In short, each firm is aware of its impact upon the others. Though each may independently decide upon its own course of action, any rational decision must take into account the anticipated reaction of the other two firms. Whenever rational decision-making requires an estimate of the impact of any decision on the remaining firms and an estimate of their response, decisions are said to be "interdependent." Because of their mutual awareness, oligopolists' decisions may be interdependent although arrived at independently."

Areeda, Antitrust Law S 1429 (1986). See Bogosian v. Gulf Oil Corp., 561 F.2d 434, 446 (3d Cir. 1977).

Because the evidence of conscious parallelism is circumstantial in nature, courts are concerned that they do not punish unilateral, independent conduct of competitors. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 594 (1985). They therefore require that evidence of a defendant's parallel pricing be supplemented with "plus factors." Petruzzi's IGA v. Darling-Delaware, 988 F.2d 1224, 1243 (3d Cir. 1993). The simple term "plus factors" refers to "the additional facts or factors required to be proved as a prerequisite to finding that parallel action amounts to a conspiracy." Areeda, Antitrust Law S 1433(e). They are necessary conditions for the conspiracy inference. Venzie Corp. v. United States Mineral Products Co., 521 F.2d 1309, 1314 (3d Cir. 1975); Areeda, S1434. They show that the allegedly wrongful conduct of the defense was conscious and not the result of independent business decisions of the competitors. The plus factors may include, and often do, evidence demonstrating that the defendants: (1) ac ted contrary to their economic interests, and (2) were motivated to enter into a price fixing conspiracy. See Petruzzi's, 998 F.2d at 1242.

The concept of "action against self-interest" is ambiguous and one of its meanings could merely constitute a restatement of interdependence. As the court pointed out in

19

Coleman v. Cannon Oil Company, 849 F. Supp. 1458, 1467 (N.D. Ala. 1993), refusing to raise or lower prices unless rivals do the same could be against a firm's self-interest but nevertheless could spring from independent behavior. Similarly, conspiratorial motivation is ambiguous because it "can describe mere interdependent behavior and, therefore, it could mean that interdependent behavior is a Sherman Act Section 1 conspiracy." Areeda, S 1434(c). Thus, no conspiracy should be inferred from ambiguous evidence or from mere parallelism when defendants' conduct can be explained by independent business reasons.

Once the plaintiffs have presented evidence of the defendants' consciously parallel pricing and supplemented this evidence with plus factors, a rebuttable presumption of conspiracy arises. Todorov, 921 F.2d at 1456 n.30. "[T]he mere presence of one or more of these `plus factors' does not necessarily mandate the conclusion that there was an illegal conspiracy between the parties, for the court may still conclude, based upon the evidence before it, that the defendants acted independently of one another, and not in violation of antitrust laws." Balaklaw v. Lovell, 822 F. Supp. 892 (N.D. N.Y. 1993); Todorov, 921 F.2d at 1456 n.30.

In an effort to reinforce their claim of collusive price-fixing, plaintiffs presented the testimony of an expert for the purpose of showing a pattern of parallel price increases in each of the five baby food product categories throughout the certified time period, except for the First Food category in August 1992. The plaintiffs requested Dr. Albert Madansky to conduct statistical analyses of the defendants' list price increases for the period January 1989 through December 1992. He concluded that the results of his analyses established a pattern of parallel pricing by the defendants. Dr. Madansky's conclusion is depicted infive charts. The charts represent each of the five categories of baby food: First Foods, Second Foods, Third Foods, Cereals, and Juices.

Through his analysis of the defendants' average monthly list prices, Dr. Madansky further concluded that transaction prices likewise increased in parallel fashion from 1989 to 1992. Again, similar to what he did with list

20

prices, his analysis of transaction price trend lines is depicted in five charts that reflect the five categories of baby foods. According to Dr. Madansky, the charts show that the defendants' prices moved upward in parallel fashion on 99.5% of the total volume analyzed.

The plaintiffs argue documentary and testimonial evidence also confirm that the defendants engaged in parallel pricing and prove that the price increases resulted from concerted action by the defendants. They point to an internal Beech-Nut memo of February 24, 1989, from Joseph Gaeto, Beech-Nut's Vice-President of Marketing, to Theuer stating: "We have taken a position [of] parity with Gerber to reflect our current plan for a price increase this year." In addition, Beech-Nut's 1988 Long Term Plan pontificated "Gerber will accept the price leadership of Beech-Nut and will accept price increases as a means of improving profitability." They also cite the testimony of Heinz's area manager, Ron Coble, that Heinz's "selling philosophy" from 1970 to the early 1990s was to sell their products at 29È a case below the prices of Beech-Nut and Gerber on all 24-pack merchandise. Plaintiffs argue that the maintenance of more or less constant differentials between defendants' prices is clear evidence of parallel pricing.

The plaintiffs also contend that the evidence they produced showed that the defendants' pricing was "conscious." For this purpose, they rely heavily on the reciprocal exchange in pricing information previously referred to, including the deposition testimony of Anderson and Gibbs. The plaintiffs therefore argue that sales representatives of each defendant, largely at the behest of senior management and mostly by word of mouth, maintained a continuous network to exchange price information as well as a system to communicate that information to executive decision makers. The plaintiffs claim that the evidence shows that the defendants on a consistent basis ordered their sales representatives to gather competitive information, such as their competitors' pricing plans and strategies. The plaintiffs aver that once this information was obtained, the sales representatives reported the information to their area or territory manager, who in turn passed the information on to their superiors.

21

In addition, the plaintiffs argue that the defendants' pricing data represents parallel list and transaction pricing. They assert that following the "truce" an understanding existed among the defendants not to intrude upon the other's position in the market place, which culminated in an agreement to jointly coordinate and implement price increases. In support of their theory of the defendants' price parallelism, plaintiffs claim that their expert's testimony shows statistical analysis of the defendants' list price increases per pack between January 1989 and December 1992. The plaintiffs also contend that the parallel list price increases caused the transaction prices to increase and, thus, the transaction prices suffered from parallel pricing as well. Specifically, as to the period certified for the class action, January 1, 1989 to December 31, 1992, plaintiffs maintain that defendants' list prices and actual transaction prices were higher than they would have been had the defendants not engaged in price fixing.

V.

Summary Judgment Principles

This court's review of the District Court's grant of summary judgment is plenary. Erie Telecommunications, Inc. v. City of Erie, 853 F.2d 1084, 1093 (3d Cir. 1988). We evaluate the evidence using the same standard the District Court applied in reaching its decision.

Summary judgment is warranted where "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In the context of an antitrust case, the nonmoving party's burden "is no different than any other case." Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). Hence, "summary judgment should be granted if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law." Petruzzi's IGA v. Darling–Delaware, 998 F.2d at 1230 (3d Cir. 1993).

22

The extent of what constitutes a reasonable inference in the context of an antitrust case, however, is somewhat different from cases in other branches of the law in that "antitrust law limits the range of permissible inferences from ambiguous evidence in a S 1 case." Matsushita, 475 U.S. at 588. The acceptable inferences which we can draw from circumstantial evidence vary with the plausibility of the plaintiffs' theory and the danger associated with such inferences. Petruzzi's, 998 F.2d at 1232. Therefore, the Supreme Court has held in the antitrust context "that conduct consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita, 475 U.S. at 588, (citing Monsanto, 465 U.S. at 764). Thus, to withstand a motion for summary judgment "a plaintiff seeking damages for a violation of S 1 must present evidence that tends to exclude the possibility that the alleged competitors acted independently." Id. The reason, of course, is that mistaken inferences in such a context "are especially costly because they chill the very conduct the antitrust laws are designed to protect." Matsushita, 475 U.S. at 594.

In deciding whether summary judgment is warranted, the District Court may not weigh the evidence or make credibility determinations. Big Apple BMW, 974 F.2d at 1363. Moreover, the non-movants' evidence should be analyzed as a whole and not be tightly compartmentalized to see if together it supports an inference of concerted action. Big Apple BMW, 974 F.2d at 1364.

A plaintiff in a Section 1 conspiracy can establish a case solely on circumstantial evidence and the reasonable inferences to be drawn therefrom, and the movant defendant for summary judgment bears the burden of proving that drawing inferences of unlawful behavior is unreasonable. Petruzzi's, 998 F.2d at 1230. "Nonetheless, in drawing favorable inferences from underlying facts, a court must remember that often a fine line separates unlawful concerted action from legitimate business practices." Id. Therefore, care must be exercised to ensure that inferences drawn of unlawful behavior from ambiguous evidence do not infringe upon the defendants' freedom. Id. Thus, the court must ascertain whether the plaintiffs have

23

presented "evidence that is sufficiently unambiguous" showing that the defendants conspired. Matsushita, 475 U.S. at 597.

With these principles in mind, we address the evidence before us.

VI.

Analysis of the Evidence

The District Court carefully considered the plaintiffs' evidence concerning the reciprocal exchange of price information by the defendants. The court concluded that the evidence did not support an inference of a conspiracy to fix prices but portrayed nothing more than intense efforts on the part of three large and strong competing companies in the baby food industry to ascertain:

> [w]hat their competitors would be doing with regard to pricing, promotions and products. . . . These instances do not allow the inference of some conspiracy to fix prices. Much of the specific instances cited by plaintiffs concern not pricing information, but promotional or product information of certain defendants which were reported by other defendants." D.C. Op. at p. 27.

With respect to the written documents of one competitor found in the files of another, the court determined that many of them reflect competitive information concerning the discontinuance of products or changes in product ingredients or in packaging. It concluded that the presence of this information was consistent with independent action and not grounds for assuming "some shadowy conspiracy." Id.

The plaintiffs assert that the exchange of pricing information by lower level employees is sufficient to defeat a motion for summary judgment in Section 1 cases.[8] We
_____

8. At oral argument, the plaintiffs cited the following cases as authority for this assertion: Vernon v. Southern Calif. Edison Co., 955 F.2d 1361 (9th Cir. 1992); In re Coordinated Pretrial Proceedings, 906 F.2d 432 (9th

24

disagree. Evidence of sporadic exchanges of shop talk among field sales representatives who lack pricing authority is insufficient to survive summary judgment. Krehl v. Baskin Robbins Ice Cream Co., 664 F.2d 1348, 1357 (9th Cir. 1982). Furthermore, to survive summary judgment, there must be evidence that the exchanges of information had an impact on pricing decisions. See Krehl, 664 F.2d at 1357. Plaintiffs, for this purpose, rely on their expert's opinion that concerted action drove the transaction prices up 6.16%.

The plaintiffs here contend that the holdings of United States v. Container Corp. of America, 393 U.S. 333 (1969) and United States v. United States Gypsum Co., 438 U.S. 422 (1978) compel the conclusion that the evidence they presented concerning the exchange of future pricing information impacted the market as a whole and is more than sufficient to survive summary judgment. We do not agree.

In Container Corp., the court held that the reciprocal exchange of price information pursuant to an agreement by the defendants was concerted action sufficient to establish a price-fixing conspiracy. It analogized the agreement among the defendants there with the "sophistication and well-supervised plan for the exchange of price information between competitors" in American Column & Lumber Co. v. United States, U.S. 257 U.S. 377 (1921) and the "elaborate plan for the exchange of price data among competitors" in United States v. American Linseed Oil Co., 262 U.S. 371 (1923).

_____

Cir. 1990); Rosenfield v. Falcon Jet Corp., 701 F.Supp. 1053 (D.N.J. 1988). However, we conclude that none of these cases support the plaintiffs. Vernon did not involve price-fixing; rather, it concerned whether the defendant denied the plaintiff access to certain power transmission lines. In Pretrial Proceedings, testimony indicated that upper level executives engaged in secret conversations regarding product pricing. Id. at 450. Similarly, in Rosenfield, testimony showed that several upper level executives "were aware of the price information exchange and considered the data obtained by sales engineers to set the price of business jets." Id. at 1064.

25

In Container Corp., the plaintiffs presented direct evidence of an agreement among the defendants to exchange pricing information, as well as evidence that once a defendant had the competitors' pricing information, in a "majority of instances," the defendant quoted the same price as his competitor. This compared to evidence of periods where there were no pricing exchanges and "exceptionally sharp and vigorous price reductions resulted." See 393 U.S. at 340 (Fortas, J., concurring). Conversely, in Gypsum, the Court could not have been more clear: "The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." 438 U.S. at 443 n.16.

The plaintiffs also complain that the District Court improperly weighed Anderson's testimony and failed to even consider Gibbs' testimony. Anderson was a salesman, who characterized his status as "a little mouse." He had no authority to set the prices for the baby food he sold. His superior did not instruct him to provide competitors with information. He considered himself a good salesman, and, therefore, his practice was to garner as much information as he could find "in the street" about the competition. Whatever competitive information he acquired he passed on to his superior. The information came from chit-chat during chance encounters in the field among competitors' employees with whom he was acquainted. Runk, his superior, never directed him to disseminate Heinz price information to competitors in the field.

We have held previously that communications between competitors do not permit an inference of an agreement to fix prices unless "those communications rise to the level of an agreement, tacit or otherwise." Alvord-Polk, 37 F.3d at 1013. See also Amey, 758 F.2d at 1505 (11th Cir. 1985)(Exchange of pricing information by itself is an insufficient basis upon which to allow an inference of agreement to fix prices); Market Force Inc. v. Wauwatosa Realty Co., 906 F.2d 1167, 1173 (7th Cir. 1990)("[i]t is well established that evidence of informal communications

26

among several parties does not unambiguously support an inference of a conspiracy.") Gathering competitors' price information can be consistent with independent competitor behavior. See e.g., Stephen Jay Photography Ltd. v. Olan Mills, Inc., 903 F.2d 988, 996 (4th Cir. 1990); Wallace v. Bank of Bartlett, 55 F.3d 1166, 1169 (6th Cir. 1995).

The District Court appropriately discounted Gibbs's testimony entirely because he gave it in another proceeding involving Heinz's vinegar product, not baby food. Neither Gerber nor Beech-Nut manufactured vinegar. Moreover, he testified that (1) any communications he had wit h competitors were neither related to setting the price of vinegar nor related to any agreement with competition on the price of vinegar, (2) the information he commu nicated was all current or public, and (3) Heinz generally did not act on any information obtained through those communications. We see no error in the court's treatment of Gibbs's testimony.

The plaintiffs also argue that the assortment of memoranda found in the files of the defendants concerning advance prices of competition, one or two of which were unexplained, proved "a pervasive exchange of confidential information concerning future promotions." We do not believe that the mere possession of competitive memoranda is evidence of concerted action to fix prices. In a highly competitive industry, as is the baby food industry, intensely dependent on marketing strategy, it makes common sense to obtain as much information as possible of the pricing policies and marketing strategy of one's competitors.

> The fact that the price information about one company is found in a competitor's files or an employee reports a competitor's pricing policy to his home office and the two companies charge similar prices for their products, without more, cannot support an inference that the two competitors entered into an agreement to share prices. To successfully raise an inference that two competitors agreed to share price information, a complainant must produce some evidence which tends to exclude the possibility that the competitors acted independently.

27

Stephen Jay Photography, 903 F.2d at 996 (citing
Monsanto, 465 U.S. at 764).

The plaintiffs stressed during trial and on appeal the
significance of the evidence concerning the "truce." They
argue that the District Court simply erred in its treatment
of all the evidence presented regarding this incident. They
contend that the District Court failed to discuss the 1984
memorandum from Hoyvald to Biggar, in which Hoyvald
stated that all large competitive counter-offers have been
eliminated, or Heinz's rejection of McCloskey's
recommendation for Heinz to enter the Chicago market in
1988 and 1991. Further, they take issue with the court's
conclusion that the 1984 truce memorandum was
"irrelevant to Gerber" and "clearly as consistent with
normal business conduct as it is with some alleged
conspiracy between Heinz and Beech-Nut."

The plaintiffs failed to present any evidence
demonstrating that Gerber was involved in a "truce." In
considering the evidence relating to the "truce," the District
Court concluded:

> [t]here is evidence that 1984 marked the end of a trade
> war in the baby food business, and certain customers
> at that time, in certain areas of the country, utilized a
> "two-brand approach." This meant that those
> customers would stock Gerber products and either
> Heinz or Beech-Nut products. . . . The Court notes that
> it would be irrelevant to Gerber if this truce did in fact
> exist, so the Court declines to make the leap that
> Gerber had any input into an alleged "truce."

Op. at 33. As to Coble's explanation for his isolated, single
use of the term in his 1984 memorandum, the District
Court concluded that the deposition testimony of other
Heinz employees "corroborate[d] the fact that Heinz was
skittish about doing anything which might erupt in another
conflagration in the industry. This evidence is clearly as
consistent with normal business conduct as it is with some
alleged conspiracy between Heinz and Beech-Nut." Id. at
33-34. We agree.

The "truce" expression relied on by the plaintiffs was
largely intended to buttress their case on reciprocal price-

28

fixing. However, the single use of the term in a highly competitive business environment and in the face of continuing fierce competition is as consistent with independent behavior as it is with price-fixing. Furthermore, the explanation for the use of the term by an employee without price-fixing authority is more plausibly explained as an exercise of independent business judgment by Heinz not to enter a new market. The evidence reflects Heinz's strategic planning as to whether and when to pursue particular business opportunities. We are unwilling to question such business judgment. Furthermore, the price-fixing inferences that the plaintiffs would have us draw from this evidence, which relates ostensibly to business competition and not price-fixing, require us to make an unjustified jump in judgment that this record does not warrant, especially in the face of the District Court's conclusion.

The plaintiffs place great weight on Heinz's decision not to invest in the Chicago and the Miami markets. 9 However, such investment required substantial capital expenditures and resource commitments. Only Heinz was in a position to decide whether it was in its best interest to make such commitments, particularly in light of its interests in many other products in the general food industry. Only it knew how much spending on promotion and allowances would be required to penetrate the Chicago market, and how much competitive resistance it would encounter, whether the cash flow generated would justify committing a portion of its finite marketing budget, or whether there were better opportunities elsewhere. We can discover no hard evidence that allowances and promotion activity was abandoned at the time or in the geographic territory referred to in these documents.

Moreover, Coble's 1984 memorandum, which used the

_____

9. Plaintiffs assert that Heinz's McCloskey strongly advocated that Heinz enter the Chicago market in 1988 and 1991 and its unwillingness to enter proves that the 1984 "truce" remained in place. Plaintiffs ignore, however, the effort of Heinz to enter the Chicago market in 1988, evidenced by its formal, written proposal to Dominick's, a large Chicago supermarket chain. Dominick's rejected the proposal.

29

term "truce," also reports aggressive competition: "We attempted to expand our distribution from July to November 1983, but were unsuccessful in obtaining any significant distribution gains. Every attempt to dislodge Beech-Nut was met with defensive programs that were substantial." Furthermore, there would be strategic issues for Heinz to consider, that might draw fire from its competitors. They could aggressively respond to Heinz's territorial expansion in the expanded area and in other territories that might prove the expansion to be eruptive, destructive, and expensive. These considerations may have weighed against the likelihood of long-run success in Heinz's ability to maintain its presence on retail shelves and gain market share in the face of its competitors' response. Such decisions are consistent with permissible, rational competitive conduct. We therefore hold that plaintiffs' evidence pertaining to the alleged "truce" is not sufficiently probative of unlawful concerted action.

The plaintiffs argue that they presented substantial evidence that the defendants' list and transaction prices increased in parallel fashion. In addition to their expert's affidavit, they also state that the testimony of other witnesses and documentary evidence confirm that the price increases were attributable to the defendants' consciously parallel action. On appeal, therefore, they vigorously assert that the District Court overlooked and otherwise disregarded this important evidence of conspiratorial price-fixing.

In the absence of direct evidence, as we previously stated, consciously parallel business behavior can be important circumstantial evidence from which to infer an agreement in violation of the Sherman Act. Weit, 641 F.2d at 462. Although "mere consciously parallel behavior alone is insufficient to prove a conspiracy, it is circumstantial evidence from which, when supplemented by additional evidence, an illegal agreement can be inferred." Petruzzi's, 998 F.2d at 1242. In an oligopoly consisting of no more than three companies at one time and collectively controlling almost the entire market, there is pricing structure in which each company is likely aware of the pricing of its competitors. The District Court in this case

30

concluded that upon examining the charts prepared by plaintiffs' expert, Dr. Madansky, the defendants' prices were not parallel. The plaintiffs were "unable to show that defendants' prices moved in a parallel fashion. This is true both for list prices and transaction prices. . . . On this basis alone, plaintiffs' case fails." D.C. op. at 21.

The District Court noted that there were many "clear instances," for example, when Gerber raised its prices and Beech-Nut lowered theirs or kept them the same. For instance, "in March of 1990, Gerber raised the prices . . . [and] [i]n that same period, Heinz lowered its prices." D. C. op. at 23-24. The court also pointed to many instances where Gerber either lowered its prices or kept them the same when Heinz and/or Beech-Nut raised theirs. Id. at 24. The court also observed upon examining Dr. Madansky's report that all during the alleged conspiracy period, "there were fifteen instances (out of 175) where Gerber, Beech-Nut, and Heinz all raised their prices. There were seven instances where the three lowered their prices, and there were five where they kept them the same." Thus, it concluded that "15.5% of the time, Gerber, Beech-Nut, and Heinz made similar pricing decisions. . . . That leaves, however, 84.5% of the time during which defendants priced their products differently." (Id. at 24).

From our own analysis of the evidence, we perceive no error on the part of the District Court in concluding that the evidence was insufficient to prove conscious parallelism. Because Gerber controlled 70% of the market in baby foods and was the acknowledged leader in this industry, Gerber's pricing understandably may have had an influence on its competitors' pricing. Conscious parallelism, however, will not be inferred merely because the evidence tends to show that a defendant may have followed a competitor's price increase. See, e.g., Theatre Enterprises v. Paramount Film Dist. Corp., 346 U.S. 537, 541 (1954); Clamp-All Corp. v. Cast Iron Soil Pipe Inst., 851 F.2d 478, 484 (1st Cir. 1988).

The plaintiffs complain that the District Court disregarded the testimony of their expert, Dr. Madansky, with respect to parallelism. We can well understand the District Court's attitude toward this expert's testimony and

31

supporting charts. In an industry with hundreds of products and a pervasive policy of allowing discounts and promotional allowances to purchasers, allowances that varied even to the same customer if it conducted business in different geographical areas, charts and reports focusing on list prices rather than transactional prices have little value. "Especially in an oligopoly setting, in which price competition is most likely to take place through less observable and less regular means than list prices, it would be unreasonable to draw conclusions about the existence of tacit coordination or supracompetitive pricing from data that reflect only list prices." Brooke Group, 509 U.S. at 236.

Yet, the plaintiffs focus on the defendants' list pricing. In their initial brief, they assert that Dr. Madansky proffered substantial, uncontroverted evidence from which a jury could find "list price parallelism." They also point to Dr. Madansky's January 14, 1997 affidavit in which he analyzed "defendants' list prices and submitted five charts . . . graphically depicting the parallel movement of defendants' list prices over time." Id. (Emphasis added) Without making any effort, or offering any explanation for his failure to do so, Dr. Madansky made no statistical analysis of the movement of defendants' transaction prices. His conclusion with respect to transaction prices is reached by simply comparing defendants' list prices over time with the corresponding trend line of average monthly transaction prices on a per pack basis to show that following list price increases, transaction prices increased. Dr. Madansky's original testimony and report made no reference to transactional prices. Dr. Madansky made no in-depth analysis of transaction prices. His affidavit of January 14, 1997, came as a response to the District Court's request and arguments of defendants' counsel at the oral hearing on the motion for summary judgment.

Furthermore, Dr. Madansky's analysis did not consider any transaction pricing for Nestle/Beech-Nut.10 Moreover,

_____

10. Dr. Madansky initially set out to determine the prices paid by the plaintiffs to the defendants for baby food products. His results were based on "the monthly dollar-volume weighted average of the per ounce price paid by Gerber and Beech-Nut customers who qualified for pricing at the 40,000 lb. or over price bracket and by all Heinz customers for the baby foods comprising Gerber's First Foods, Second Foods, Third Foods, Juices, and Cereals categories . . . ." The purpose at the time apparently was to provide a basis for damages.

32

he relies on "trend lines" of average transaction prices, not actual prices of the other companies, to reach a conclusion that transaction prices increased following list price increases. We do not believe that trend lines of average prices are a reliable indicator of transactional prices. Moreover, a trend line showing an increase in transaction prices for baby foods during a period of the economy when general food prices were increasing is readily understandable and charts depicting it are not helpful as evidence of parallelism. See Consumer Price Index -- All Urban Consumers, Bureau of Labor Statistics, Food and Beverages, 1967-1998.

We see a further weakness in the methodology of Dr. Madansky's report that also furnished a sufficient basis for the District Court to reject it as proof of parallelism. The defendants sold their baby food products by the case and priced their sales by the case. Dr. Madansky's report of conscious parallelism is predicated on a per ounce basis. In response to the criticism his initial report evoked at the summary judgment hearing, Dr. Madansky submitted his January 1997 affidavit in which he concluded that "a per pack (i.e. per unit) basis during the period January 1989 through December 1992 in each product category reveal[ed] that defendants increased their list prices in parallel fashion." (Emphasis added). He then leaped to the conclusion, ipse dixit, that "[a] per case analysis . . . would yield the same results as [his] per pack analysis because case sizes in the relevant baby food categories did not change during the period." Again his conclusion is based on list prices.

The plaintiffs also point to the charts provided in Dr. Madansky's January 1997 affidavit as proof that the defendants' prices exhibited parallel behavior. There are 31 charts. Charts 1-5 represent a comparison of defendants' list price increases on a per pack (i.e. per unit) basis and purport to show that defendants' list prices increased in parallel fashion. However, the pertinent inquiry is on the prices actually paid, the transaction prices. Thus, these charts' probity is minimal. Charts 6-20 represent "[a] comparison of defendants' list price increases over time with the corresponding trend line of average monthly

33

transaction prices on a per pack basis." However, the defendants sell baby food to their customers by the case. Therefore, these charts do not reflect case transaction prices.

Charts 21-26 purport to compare "defendants' list prices to defendants' monthly average transaction prices on a per pack basis in the month immediately preceding their next list price increase." These charts focus on Dr. Madansky's use of trend lines. These trend lines reveal nothing more than that the transaction prices tended to increase over time. However, such analysis has been explicitly rejected by the Supreme Court. "[R]ising prices do not themselves permit an inference of a collusive market dynamic. Even in a concentrated market, the occurrence of a price increase does not in itself permit a rational inference of conscious parallelism or supracompetitive pricing." Brooke Group, 509 U.S. at 237.

The explanation proffered by the plaintiffs for Dr. Madansky's calculations on a per ounce basis is that it provided a common unit for the defendants' products because they sold some of the same products in different size jars. The use of a per ounce calculation, however, especially when utilizing list prices, reflected prices within a fraction of one cent of each other. The District Court commented that such a methodology was at odds with marketing practices for "the industry does not use [per ounce prices] when setting list prices. Per ounce prices are necessarily within a fraction of one cent of each other due to the relatively minimal per ounce cost." D.C. Op. at 24. As the defendants observe, if Dr. Madansky had performed his analysis on the basis of quarter-ounces, the distribution prices would appear even closer together. They claim his conversion into ounces "is an attempt to mask the real price differential." The defendants argue that analyzing price differentials on a per ounce basis is misleading.

> For example, by reducing prices from a per-case basis to a per-ounce basis, plaintiffs reduced the unit of measurement by a factor of almost 100 in the case of Gerber Second Foods (one case equals approximately 96 ounces) and by a factor of 30 in the case of Gerber First Foods (one case equals 30 ounces). When prices

34

are measured properly, in terms of price per case, plaintiffs cannot argue that each of the defendants' prices are within cents of each other.

In response to this telling criticism of the inappropriate use of the per-ounce calculation, Dr. Madansky's January affidavit moved to a per-pack comparison. He then leaps the gap to a per-case analysis. He accomplishes this with the aid of a slender, unsupported strand in his affidavit stating that a "per case analysis (adjusting for Gerber's smaller case size in First Foods) would yield the same results as my per ounce analysis because case sizes in the relevant baby food categories did not change during the period." This amounts to nothing more than an observation which adds little substance, if any, to his opinion.

In their appeal to this court, the plaintiffs rely on the per-pack analysis made in Dr. Madansky's January affidavit. Although this is a more reasonable unit size, the defendants observe that the plaintiffs do not argue that the per-package analysis of defendants' list or transaction prices were within cents or fractions of cents of each other, nor could they. Moreover, the defendants argue that the step graphs generated by Dr. Madansky in his January 1997 affidavit compress the time axes to a minute scale to create the illusion of parallel pricing. In addition, as we have previously mentioned, the step graphs are based on list prices and the accompanying charts (Numbers 27-31) depict average monthly price trend lines on a per pack basis.

Even when measured in ounces, as the defendants' analysis of the Madansky data illustrates, the evidence shows that the defendants' actual transaction prices moved in different directions more often than not. The undisputed evidence shows similar disparities with respect to list prices: sometimes competitors did not follow price increases at all, other times they followed by less, sometimes by the same amount, and sometimes they followed only in certain geographic areas.

With respect to the plaintiffs' contention that the District Court ignored substantial testimony of defendants' own employees that confirmed the parallel movement of

defendants' list prices, as well as their expert, we turn to the specific documents and testimony to which they point in support of this argument. The plaintiffs refer to two documents: (1) a February 24, 1989 memorandum from Joseph Gaeto, Beech-Nut Vice President of Marketing, to Richard Theuer, Beech-Nut's then President, stating "we have taken a position [of] parity with Gerber to reflect our current plan for a price increase," and (2), a Heinz communication dated Nov. 5, 1991, from employee Wyker to his superior that "requests approval to implement a Grocery Baby Food Price Increase to match the recently announced Gerber Price Increase." The plaintiffs note that, in sharp contrast to the District Court's conclusion, the defendants' own economic expert, Dr. Almarin Phillips, as well as Coble, testified that it was Heinz's general policy to maintain a "more or less constant differential" between Gerber's list prices and Heinz's list prices. Id.

The District Court may not have specifically addressed this testimony but that does not mean the court ignored it. Nonetheless, we will address it in light of the plaintiffs' argument on appeal. The Beech-Nut memorandum regarding cereal prices confirms the plaintiffs' assertion that Beech-Nut has "taken a position [of] parity with Gerber." However, plaintiffs omitted the preceding phrase explaining that the position was taken "[F]or market reasons. . . ." Furthermore, the charts Dr. Madansky generated show that Nestle/Beech-Nut's list cereal prices were not at parity with Gerber's prices. The charts show that in February 1989, the same month as the date on the Beech-Nut document, Gerber's cereal prices jumped from slightly below Beech-Nut's prices to well above those prices, and that Beech-Nut's cereal prices did not rise again until seven months later, shortly before Nestle left the baby food business. The same Nestle/Beech-Nut document upon which plaintiffs rely repeatedly emphasizes that prices were being raised due to market factors, including increased costs in raw materials and packaging, and that the incremental price increase was less than the increase in costs. This document, therefore, reflects Beech-Nut's competitive behavior and not conscious parallelism.

Contemporaneous documents also show that Heinz made independent pricing decisions in 1989. On February 14,

36

1989, Joe Fay, Heinz's product manager, sent Robert Roussey, Heinz's general business manager, a memorandum obtained from the trade, attaching a copy of Gerber's announced wholesale price advance effective February 13, 1989. Fay recommended that Heinz follow immediately on four of its food categories, but delay announcing any strained 4.2 oz juice price increase"till we've analyzed the strained retail pricing analysis study." On March 2, 1989, Fay recommended that Heinz implement a price increase effective May 4, 1989, to"match Gerber's and maintain our per ounce case differentials versus Gerber" on Junior, Meat, Cereal, and Juice.

Conversely, Fay also recommended Heinz increase prices by only 11c or 2% on Beginner Foods, compared to Gerber's price increase of 40c on the same product segment due to Heinz's "inability to obtain our desired retail price differential using larger LTA [long term allowance] and smaller base cost differential." A revised Fay memorandum dated March 23, 1989, reflecting Heinz's decision to depart from Fay's original recommendation, was attached to the final product price change form. Furthermore, the memo revealed Heinz's decision not to match Gerber increases in Meats or Junior Foods, and "to expand our retail price differentials to levels (2-3c on Meats, 4c on Junior Foods) which will improve the volume of these historically declining businesses."11 Thus, these memoranda show in-depth, unilateral behavior, not collusive conformation.

The defendants' personnel and expert testified that it was Heinz's general policy to maintain a "more or less constant differential" between Gerber's list prices and Heinz's list prices. Contrary to the plaintiffs' argument, the District Court did not ignore this testimony. Rather, the testimony

—————————————————————————————————————————————

11. We observe that most of the documents introduced by the plaintiffs merely discuss "rumors" that the authors heard or "suspicions" that they had. As such, the documents can be discounted as non-probative for they show a lack of knowledge about the competitors' pricing and are inconsistent with a price-fixing scheme. For example, in the March 2, 1990, Beech-Nut document to which the plaintiffs point, the author merely states that he "anticipates" a Gerber price increase in the first quarter of 1987. In another Beech-Nut document the author has had heard "very strong rumors" of a Gerber price increase. App. at 3893a.

shows a business judgmental policy to offer the public consumer a "value brand" at a price less costly than the price offered by the market leader, Gerber. This policy fails to prove parallel price behavior.

Market realities also clearly controvert the plaintiffs' contention. On March 30, 1987, six months after Beech-Nut's price increase, Heinz increased the list price on cereal by an amount that was less than Gerber and Beech-Nut to maintain its traditional position "as the price value brand." The same fiscal year 1987 price increase memorandum recommendation to Roussey noted that "[i]n September FY87, Beech-Nut attempted to lead the industry with a price increase (+20È per case) but they were not followed by Gerber or Heinz at that time." In 1988, Heinz did not raise prices on Junior Foods, despite Gerber's price increase. Heinz chose this strategy because "[a]ny increase to these differentials due to a price increase will decrease Heinz's Junior Foods volume as a result of a weakening of its price/value positioning and possibly due to reduced distribution."

Beech-Nut, who increased its list prices three months before Heinz's increase, did not increase list prices for Junior Foods. In 1990, Heinz did not match Gerber's price increase on Junior Foods "to widen the objective Heinz-Gerber retail price differential from 4c to 5c." Supp. App. at 4892. In addition, Heinz did not match Gerber's price increase on Meats "in an effort to stabilize [its] Meats business." Id. However, in so doing, it "widen[ed] [its] retail price differential from 3c to 4c." Id.

In 1991, Heinz's D. F. Ryan recommended fiscal year 1991 baby food price increases to match Gerber's increase to "maintain our price differentials versus Gerber." The recommendation, however, excluded any price increase for Second or Third Food meats and suggested an increased price for cereal of 61c as against Gerber's increase of 80È so as to expand the unit differential between them from 4.4c to 6.0. An August 1992 memo from Heinz employee Deborah Billow informed G. Price that "Bob and I have agreed to not follow Gerber's most recent price increase on Beginner Food until January 1, 1993 when it is currently budgeted."

Although we recognize that parallel pricing does not require "uniform prices," and permits prices within an agreed upon range, Socony-Vacuum, 310 U.S. at 222, the memoranda to Roussey and the subsequent memoranda of Ryan and Billow demonstrate that the defendants did not blindly raise their prices to follow Gerber, the price leader. The defendants' prices were neither uniform nor within any agreed upon price range of each other. These memoranda reveal that the defendants engaged in independent pricing determined by market conditions at the time, profit margins, and the effect of price increases or decreases on sales volume and distribution. They provide a striking insight into the defendants' marketing strategy which negates the plaintiffs' inference of conscious parallelism.

Thus, we see no substance to plaintiffs' argument that the District Court ignored testimony and documents of the defendants' witnesses which would have confirmed the plaintiffs' case for conscious parallelism. On the contrary, defendants' marketing activities refute rather than support parallel pricing.

VII.

The Plus Factors

The plaintiffs strenuously argue on appeal that, in addition to direct and circumstantial evidence showing the defendants' joint action, they presented more than sufficient evidence of "plus factors" to defeat summary judgment. They claim that the record contains substantial evidence that all the defendants (1) had an econom ic motive to conspire in order to increase their profits, (2) had ample opportunity to conspire, and (3) acted again st their independent economic self-interests by exchanging price information, including information concerning future price increases. They assert that the District Court, in discovering no plus factors, simply ignored the evidence.12

_____

12. Despite its earlier conclusion "that there is no permissible inference of parallel pricing," the District Court devoted approximately 20% of its 34-page opinion to the discussion of the plus factors. The extensive discussion by the district court at least negates the plaintiffs' complaint
that the district court ignored the evidence.

39

In Petruzzi, we stated that a conspiracy based on consciously parallel behavior requires a plaintiff not only to show parallel behavior and awareness in their decision making, but also certain plus factors. Id. at 1242; see also Shoenkopf v. Brown & Williamson Tobacco Corp., 637 F.2d 205, 208 (3d Cir. 1980). Moreover, the Supreme Court has stated that evidence of plus factors must tend to exclude the possibility of independent conduct. Monsanto, 465 U.S. at 764.

We have undertaken a comprehensive review of the record and we do not agree with the plaintiffs that the District Court "ignored the evidence" in discovering no plus factors. On the contrary, the court determined that the evidence showed that each defendant independently was able to obtain information concerning its competitors' product pricing and promotions. The District Court concluded that the evidence did not permit it to reasonably infer a price-fixing conspiracy. D.C. Op. at 27. It stated that "[t]here [was] a paucity of written documentation evidencing any concerted exchange of pricing information." D.C. Op. at 27. Moreover, the court determined that the record simply showed that the defendants were sophisticated corporations that sought and prized competitive information concerning the activities of their competitors. D.C. Op. at 28.

In keeping with its consideration of the plus factors, the court discussed the evidence as to the defendants' advance price announcements. It noted that other courts have determined that advance price announcements " `served an important purpose in the industry.' " D.C. Op. at 29, (quoting Reserve Supply Corp. v. Owens-Corning Fiberglass Corp., 971 F.2d 37, 54 (7th Cir. 1992)). The court concluded the defendants' advance notices do not support proof of concerted action by them; many of the documents to which plaintiffs point speak only in terms of "a suspicion or rumor that one of the defendants would be raising prices or making changes to a particular product." D.C. Op. at 29. As examples, it pointed to a Beech-Nut budget document dated December 31, 1986, in which Beech-Nut President Theuer stated that he "anticipated a Gerber price increase." Id. (Emphasis added). The court also observed in another Beech-Nut document that the author stated that he

40

"strongly suspects" that Gerber would increase prices on March 2, 1990. Id.

The court determined that the nature of the exchanges of information among the defendants' sales representatives amounted to mere "chit chat" at chance meetings or trade shows among persons with no pricing authority. Op. at 30. The court further noted that courts generally reject conspiracy claims that "seek to infer an agreement from . . . communications despite a lack of independent evidence tending to show an agreement and in the face of uncontradicted testimony that only informational exchanges took place." Op. at 31, (quoting Alvord-Polk, 37 F.3d at 1014). The trial judge's perceptive observation is correct.

The District Court also dealt with the evidence of opportunity to conspire emphasized by the plaintiffs. In Petruzzi, this court, in considering plus factors, did not attach much weight to evidence of opportunity. We noted that evidence of social contacts and telephone calls among representatives of the defendants was insufficient to exclude the possibility that the defendants acted independently. 998 F.2d at 1242 n.15. The trial court also concluded that "[s]uch evidence of `opportunity' should be accorded little, if any weight. Company personnel do not often operate in a vacuum or `plastic bubble'; they sometimes engage in the longstanding tradition of social discourse." Op. at 32.

The court concluded that there were a number of reasons to reject plaintiffs' argument with respect to motive to conspire. The court reasoned that if there were a conspiracy, Gerber, the market leader, would not lower its prices from time to time while at or about the same time, Beech-Nut or Heinz, or both, raised their prices. Furthermore, if, as the plaintiffs contend, the defendants had a motive to achieve higher prices, "then every company in every industry would have such a `motive.' " (D.C. op. at 32). Accordingly, it concluded that Heinz and Beech-Nut had no motive to enter into a price-fixing conspiracy with Gerber.

In further consideration of the plus factors, the court also turned to the Coble testimony concerning the alleged truce

41

and the testimony of other employees. The court found that the testimony failed to support the plaintiffs' argument as to plus factors. This evidence, the court found, showed only Heinz's fear that penetrating territory dominated by a competitor "might erupt in another conflagration in the industry." (D.C. op. at 33).

We agree with the District Court that the plaintiffs' evidence of alleged plus factors do not prove concerted, collusive behavior, although our reasoning may differ. We also have examined the testimony of plaintiffs' expert, Dr. Sam Peltzman, on whom the plaintiffs largely depend for proof of motive and conduct contrary to self-interest. Dr. Peltzman supplied the plaintiffs with two affidavits, the latest and more substantive of which was dated January 1997.

In summary, his affidavits opine that there is a perfectly plausible motive for a firm like Heinz or Beech-Nut to engage in a conspiracy even if it "locks" itself into a 15% market because their profits from the conspiracy would be greater than from acting independently. (Peltzman Aff. I at P3) He rejects the claim that Heinz or Beech-Nut could have obtained the full benefit of a conspiracy by merely following Gerber's price increases as inconsistent with economic theory because, absent a conspiracy, Gerber would have set a lower price. Further, he stated that if Heinz or Beech-Nut determined their prices independently, their respective prices would have been lower, and their sales of baby food would have been higher, than under a price-fixing agreement. (Peltzman Aff. I at P4) Finally, he avers that economic theory suggests that Nestle and Ralston would do better with conspiratorial prices than without them so that, absent the conspiracy, their losses on the Beech-Nut business would have been greater still. (Peltzman Aff. I at P5)

Without examining the validity of Dr. Peltzman's economic speculations, serious consideration may not be attributed to them because his opinion was based on the express assumption that the defendants had agreed to conspire. His assumptions and conclusions rest on the basic premise that there is an ongoing conspiracy. In his deposition of February 1996, he acknowledged that his

42

opinion assumed there was a conspiracy beginning January 1, 1984 and lasting until December 31, 1993. For example, he rationalizes:

> If Heinz or Beech-Nut determined their sales independently, free of any restraint imposed by a conspiratorial agreement, the total sales of baby food would be higher and prices lower than would be obtained under an agreement. It is precisely this specter of lower prices and profit margins from independent behavior which provides the incentive for the parties to enter into and maintain a price-fixing agreement.

Moreover, he knew nothing about the baby food industry other than "the knowledge one acquires as a casual consumer."

When Dr. Peltzman was subsequently deposed, he acknowledged that he had not undertaken any independent study of the baby food business in connection with his assignment in this case. He further conceded that he had no analysis of pricing by these defendants, except to review the average transaction prices reported in Table 1, as revised, by Dr. Madansky. He further acknowledged that he had not undertaken any review or study of the particular buyers of baby foods from the defendants in this case. Neither had he made any analysis of promotional programs nor looked at whether the baby food industry fits the model of manufacturers following in their pricing practices the price leader.

With such limited information before him, Peltzman opined that each of the defendants had a motive to engage in a conspiracy, even if they "locked" themselves into a 15% market share because "their profits from the conspiracy would be greater than from acting independently," and that any benefit that Heinz and Beech-Nut could have obtained by simply following Gerber's list price increases is inconsistent with basic economic theory. Peltzman's opinion is nothing more than an abstract statement based on "economic theory" that the interest in enhancing profits motivated the defendants to conspire. He never made any reference to the evidence in this case; he never analyzed the

43

pricing conduct of any of the defendants. In a free capitalistic society, profit is always a motivating factor in the conduct of a business. Profit is a legitimate motive in pricing decisions, and something more is required before a court can conclude that competitors conspired tofix pricing in violation of the Sherman Act. Here, there is nothing more or unusual other than the alleged instances of trade wars between the defendants. Thus, if a firm's motivation is merely to meet rival prices, it would constitute only interdependence. Accordingly, to prove conspiracy, evidence of action that is against self-interest or motivated by profit must go beyond mere interdependence. Parallel pricefixing must be so unusual that in the absence of an advance agreement, no reasonable firm would have engaged in it. Coleman v. Cannon Oil Co., 849 Supp. 1458, 1467 (M.D. Ala. 1993).

With respect to the defendants' alleged conduct contrary to self-interest, Peltzman also assumes that as conspirators, the defendants "exchanged with each other information about price changes and changes in marketing plans, such as increased couponing and changed promotional allowances prior to the announcement to the trade." No evidence in this record, however, shows that any executive of any defendant exchanged price or market information with any other executive. As we have already noted, any information obtained about a competitor was information plucked from the trade in the marketplace, "chit-chat" of field representatives, and their informal and casual conversations at trade shows or while stocking shelves. This desultory collection of information"on the street" by sales representatives is far removed from a concerted reciprocal exchange of important pricing and marketing information by the officers of major companies, particularly an exchange pursuant to an agreement.

Even assuming the admissibility of Dr. Peltzman's opinion, we conclude that his testimony and report offers little substance, if any, to advance the defendants' argument that the defendants acted contrary to their self-interest. An expert opinion based on the meager superficial information on which Peltzman relied is highly speculative, unreliable, and of dubious admissibility before a jury.

44

"When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." Brooke Group, 509 U.S. at 242. See also Advo v. Philadelphia Newspapers, Inc., 51 F.3d 1191, 1199 (3d Cir. 1995). We, therefore, conclude Dr. Peltzman's opinion offers meager evidence of defendants' behavior contrary to self-interest and of motivation to conspire.

We need not dwell on plaintiffs' contention that evidence of the "alleged" truce and the unwillingness of Heinz to enter the Chicago or Florida areas as conduct against its own self-interest. We previously discussed this argument and our rationale then is sufficient reason to reject this evidence as a plus factor. Plaintiffs cite to Milgrim v. Loews, 192 F.2d 579 (3d Cir.), cert. denied, 343 U.S. 929 (1952), in support of their argument that Heinz's rejection of advantageous offers constitutes a plus factor. Milgrim involved the distribution of films in the movie industry in which eight distributors were charged under the Sherman Act for refusing to distribute first run films to plaintiff's drive-in theaters. All eight distributors acted in "complete unanimity" in refusing to license features on first-run films to plaintiff even when offered a higher rental. All acted in substantial unanimity in refusing to make sure that feature films were available to plaintiff until after a 28-day run in conventional theaters. Id. at 583. The court therefore concluded that "each distributor has thus acted in apparent contradiction to its own self interest . . . for the conduct of the distributors is, in the absence of a valid explanation, inconsistent with decisions independently arrived at." Id.

Milgrim is inapposite. Instead of joint and conspiratorial activity to fix prices and eviscerate competition as the plaintiffs in this case claim, our review of the record convinces us that the evidence overwhelmingly establishes that the defendants in their marketing activities acted independently rather than in "complete unanimity," competitively rather than conspiratorially, and aggressively rather than supinely.

45

Some illustrations follow. In an intra-corporate memorandum dated December 15, 1989, from Heinz's Gorsky to all division and assistant division managers, he explained that the reason for a price increase was "[r]ising costs for raw ingredients, packaging materials, and fringe benefits." Heinz continued to emphasize a "two brand strategy" to oust Beech-Nut from markets and accounts, and Beech-Nut countered with aggressive competitive activity against Heinz. Heinz's Five Year Business Plan, dated October 1989, constituted a ninety million dollar program approved by the Heinz board of directors to renovate its Pittsburgh factory and lower its operating costs "in the face of intense competitive activity from Beech-Nut and Gerber." This demonstrates aggressive competitor activity, not collusive, price fixing behavior.

Continuing, a Sales Division Activity Report for January 1989, reflects Heinz's loss of several important accounts to substantial competitive offers by Beech-Nut. A Heinz Baby Food Presentation for Dallas, Texas, refers to implementation of a "Texas Defense Program" in 1988 undertaken specifically to protect against Beech-Nut's major push to enter Texas's principal markets. A November 1988 Heinz report noted that "Beech-Nut continues to be aggressive and as a result has forced us to spend heavily to defend our distribution base." A September 27, 1988 Heinz Activity Report noted that Beech-Nut was aggressively pursuing Heinz's accounts in a number of markets and that Heinz's defensive measures had been generally effective. A November 1988 Heinz report noted that "Beech-Nut continues to be aggressive and as a result has forced us to spend heavily to defend our distribution base." A May 1992 Heinz report describing a Detroit business program initiated in May 1990 after Beech-Nut "assaulted the Detroit district" noted a fiscal year 1991 increase of 74% in discounts and allowances. This too demonstrates independent, aggressive action, not collaborative, concerted conduct.

Various business documents also reflect Heinz's desire to gradually reduce "deal spending," i.e., promotions and allowances as early as September 1984. This was met by continued, competitive pressures as reflected by Heinz's

46

Business Plan FY86 referring to "Beech-Nut's continuing roll-out of Stages as a full line replacement for Heinz Wet." The Plan shows that by the end of 1985, Heinz was worried about the "fiercely competitive environment," viewing Beech-Nut as "a formidable competitor" whose "aggressive new distribution efforts have again increased the cost of doing business for Heinz Wet." Furthermore, the Plan concluded that "[i]ncreased competitive trade spending will continue to make it difficult for the Product Group and Sales to implement riskier trade spending reductions."

As for Beech-Nut, in a document dated October 30, 1984, Hoyvald wrote to Biggar regarding the 1984 fiscal budget. He stated that the problem confronting Beech-Nut was "rising costs and no general offset in selling price increases." As a consequence of the rising costs, Hoyvald stated that "we are forced to include a planned price increase in STAGES products April 1st." Id. At the same time, he observed that the baby food industry had not made a general price increase since May 1982. Finally, he noted that their budget allowed no new investments, but they planned "to work on and have ready an alternate aggressive expansion plan to be submitted at a time when a solid success story is projectable."

In a weekly position letter for the week ending September 13, 1986, a Beech-Nut employee recommended, based on Gerber's decision to reformulate the size of their first foods products, that Beech-Nut repackage its Stages One products "to maintain our exclusivity in small wholesaler and independent sources." In a January 16, 1990 Status Report, Beech-Nut's Humbarger stated that "once the sale of Beech-Nut Nutrition was announced July 5th, the competition in the category began to heat up. Both Gerber and Heinz were trying to take advantage of the situation." In a May 10, 1990 Status Report, he noted that "Gerber continues to call on our exclusive stores with money offers and free goods. Gerber has presented a program to King Kullen for consideration." This report and the earlier communications unequivocally refute any price-fixing agreement on the part of Beech-Nut with any of the other defendants.

47

With the exception of a $7,000 pre-tax profit in 1980, the first year Nestle's ownership of Beech-Nut, Nestle made no profit on its baby food business in any of the ten years during which it owned Beech-Nut. For instance, shortly before Nestle sold Beech-Nut to Ralston, Beech-Nut Baby Food Presentation documents illustrate that the Nestle/Beech-Nut's company-wide average selling price per case of baby food was $7.51 and the average cost per case was $8.23. Thus, at that time, Nestle lost an average of 72È per case for every case it sold. It is inconceivable that with losses running at least 10% for every case sold, Nestle would have remained a party to a conspiracy to fix prices, preserve Gerber's market share year after year, and run up its own losses.

As to Ralston, the plaintiffs offer no references to any Ralston business plans, internal documents, testimony, or any other evidence of record that even suggests that Ralston acted with the intention of preserving Gerber's market share. No evidence was presented establishing that Ralston ever had knowledge of price increases by either Gerber or Heinz before Gerber or Heinz announced those increases to their customers. No evidence was presented showing that either Gerber or Heinz had prior knowledge of price increases by Ralston prior to Ralston's announcements to the trade. No evidence was presented to support any claim that Ralston entered into a "truce" with Gerber or Heinz. Only expert Dr. Peltzman made reference to Ralston, and we perceive no probative value in his testimony.

With the foregoing evidence of strong, intensive competition and hardly a scintilla of evidence of concerted, collusive conduct, we can see no error in the District Court's conclusion that there was insufficient evidence to satisfy the "plus factor" requirement. The plaintiffs' argument that the record shows "that all defendants had an economic motive to conspire in order to increase their profit margins" rests solely on the unsupported opinion of Dr. Peltzman. In a free capitalistic society, all entrepreneurs have a legitimate understandable motive to increase profits. Profit is the essence of a capitalistic economy. Dr. Peltzman's bare opinion of an obvious fact cannot avoid

summary judgment. We can discover nothing in this record to show that any of the defendants acted unlawfully. The best that the plaintiffs can do is to point to ambiguous inferences.

VIII.

Conclusion

Price-fixing, we have been instructed by the Supreme Court, "includes more than the mere establishment of uniform prices." Socony-Vacuum, 310 U.S. at 222. The circumstantial evidence addressed by plaintiffs, though voluminous, lacks the essential substance to find a conspiracy. There is no evidence of record showing reciprocal exchange of information by any executive of the defendants with price-fixing authority. Despite exhaustive and prolonged discovery, no evidence has been produced showing that, during the alleged 17-year conspiratorial period, any executive of any of the defendants with price-fixing authority communicated with executives of the other defendants, either by writing, telephone or meeting. Whatever information sales representatives culled from the trade or from each other amounted to no more than an accumulation of sporadic market snippets, not an organized, concerted exchange of information among company executives or their authorized agents.

The evidence of conscious parallelism to prove tacit collusion falls far short of being probative proof of concerted action. The market here is nationwide for the two largest defendants and considerably smaller for Nestle/Ralston; their varied products are in the hundreds. Allowances and discounts to specific customers and in specific areas are pervasive, even varying at times between the same customer and with the quantities purchased and the areas served. There is no evidence that in such a diffuse and frenetic discount market there was any mechanism in place to detect conspirator cheating. Without such a mechanism, no conspiracy, if it existed, could long endure.

Because Gerber, Heinz and either Nestle or Ralston collectively controlled 98% of the baby food industry

49

nationwide, and during a prolonged period of time when wholesale food prices generally were escalating, they were an especially inviting target to attack under the Sherman Act for price-fixing. However, there is positive and unequivocal evidence that the defendants engaged in unilateral, aggressive competition limited only by budgetary considerations, cash, and market conditions.

We are cognizant that the baby food industry is highly concentrated with only three companies controlling the nationwide manufacture and distribution of their baby food products. We realize that such a scenario could facilitate explicit or tacit price-fixing. We also are aware that during the period spanned by the alleged conspiracy, wholesale food prices in the nation generally escalated; this upward movement could provide cover for non-competitive pricing practices. Furthermore, the baby food industry carries the crucial responsibility for providing much of the nutrition for almost all of the infants nationwide, an obligation that emphasizes the necessity for total compliance under the Sherman Act. As a court, however, we have the duty to examine the record carefully and decide the case fairly on the law and not on mere conjecture, ambiguous circumstantial evidence, and suspicion. The plaintiffs have not produced any evidence of an explicit agreement to fix prices and preserve market share. Drawing all inferences in their favor, they have failed to produce sufficient circumstantial evidence to prove concerted collusion that tends to exclude the possibility of independent action. See Monsanto, 465 U.S. at 768.

Accordingly, the judgment of the district will be affirmed.

IX.

Taxation of Costs

Following the District Court's grant of summary judgment, three of the defendants moved the Clerk of the District Court to tax costs for, inter alia, deposition transcripts used by the court in reaching its decision. The Clerk, relying on 28 U.S.C. S 1920(2), awarded costs to the defendants in the following amounts: Gerber: $24,299.52,

50

Heinz: $18,833.01, Nestle: $1,507.10, and Ralston: $12,221.00. On appeal to the District Court, it affirmed the Clerk's award. See Order of January 27, 1998.[13]

The plaintiffs take no issue with the amount of the costs. Their contention is that the District Court erred by ignoring the clear mandate of L.Civ.R.54.1(g)(7),[14] as well as the principal commentary accompanying that section. The commentary provides that "L.Civ.R.54.1(g)(7) allows for the taxation of deposition costs directly related to the use of the deposition transcript at trial. The key to taxability under this provision is that the transcript be `used at trial' pursuant to Fed.R.Civ.P.32.' " Lite, N.J. Federal Practice Rules, Comment 4.e to Rule 54.1(Gann 1998 ed.) at 106.

The plaintiffs argue that the Clerk lacked the authority to award tax costs because this case never reached the trial stage. Alternatively, the plaintiffs contend that the District Court erred because it was "bound by the local rules of the district where [it] reside[s]." Pl. Br. at 53. Accordingly, the court was obligated to apply L.Civ.R.54.1(g)(7). Finally, they assert that this court should review the District Court's decision de novo, because the latter made a legal interpretation of a rule of procedure.

The plaintiffs' contentions fail. First, a District Court's grant of costs is reviewed for abuse of discretion. Tilton v. Capital Cities/ABC, Inc., 115 F.3d 1471, 1474 (10th Cir. 1997) See also, Morgan v. Perry, 142 F.3d 670,682 (3d Cir. 1998). Second, section 1920 has been interpreted as permitting the taxation of costs for depositions used in deciding summary judgment motions. See, e.g., Id. This makes common sense, for to hold otherwise would penalize

_____

13. 28 U.S.C. S 1920(2) provides that a federal court may tax costs "for all or any part of the stenographic transcript necessarily obtained for use
in the case."

14. New Jersey Local Rule 54.1(g)(7) provides, in pertinent part:

> In taxing costs, the Clerk shall allow all or part of the fees and charges incurred in the taking and transcribing of depositions used at the trial under Rule 32 of the Civil Rules. Fees and charges for the taking and transcribing of any other deposition shall not be taxed as costs unless the Court otherwise orders. . . .[emphasis added.]

51

the prevailing party for winning in the early stages of the proceeding. Third, L.Civ.R.54.1(g)(7) provides a discretionary mechanism. More particularly, it provides "fees and charges for the taking and transcribing of any other deposition shall not be taxed as costs unless the Court otherwise orders." Id. The "otherwise orders" provision was explicitly utilized by the District Court in this case. The court explained that "it is clear from the Rule that this Court has the authority to award costs for any other depositions." D.C. Op. at 4.

We hold that the District Court was well within its discretion to order the plaintiffs to pay costs. Fed. R. Civ. P. 32 suggests that the "used at trial" language in the local rule should be interpreted in accordance with Rule 32, which takes a broader approach to deposition use than the literal use "at trial." Furthermore, to the extent that it conflicts with S 1920, L.Civ.R.54.1(g)(7) must give way. See Fed. R. Civ. P. 83. The order of the District Court taxing costs will be affirmed.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

52