OPINION OF THE COURT HARDIMAN, Circuit Judge This appeal involves an alleged conspiracy to fix prices in the titanium dioxide industry in violation of Section 1 of the Sherman Act. Appellant Valspar, a purchaser of titanium dioxide, claimed Appel-lee DuPont conspired with other titanium dioxide suppliers to fix prices. Valspar argued that the price-fixing agreement was made manifest primarily by thirty-one parallel price increase announcements issued by the suppliers. DuPont countered that the parallel pricing was not the product of an agreement, but rather the natural consequence of the marketplace. Specifically, DuPont posited that because the market for titanium dioxide is an oligopoly, the price movement was caused by “conscious parallelism”—an economic theory that explains oligopolists will naturally follow a competitor’s price increase in the hopes that each firm’s profits will increase. The District Court agreed with. DuPont and granted its motion for summary judgment. We will affirm. I The facts of this case were essentially undisputed in the District Court. The parties agree that the market for titanium dioxide is an oligopoly. Titanium dioxide is a commodity-like product with no substitutes, the market is dominated by a handful of firms, and there are substantial barriers to entry. Valspar, a large-scale purchaser of titanium dioxide, alleges that a group of titanium dioxide suppliers conspired to increase prices. It claims that the conspiracy began when DuPont—the largest American supplier—joined the Titanium Dioxide Manufacturers Association (TDMA) in 2002, when the association opened participation to non-European companies; Shortly after joining the TDMA, DuPont announced a price increase. Within two weeks, DuPont’s price - increase was matched by Millennium, Kronos, and Huntsman (other TDMA members and members of the alleged conspiracy). This' began what Valspar alleged to be the “Conspiracy Period”—twelve years during which the alleged conspirators announced price increases 81 times. Valspar claims the conspiracy ended in late 2013 when DuPont exited the TDMA. According to Valspar’s ‘ calculations, the conspirators inflated the cost of titanium dioxide by an average of 16%. Because Valspar purchased $1.27 billion of titanium dioxide from DuPont during the relevant period, it claims it was overcharged to the tune of $176 million. II In 2010, a class of titanium dioxide purchasers filed a price-fixing action against the suppliers in the United States District Court for the District of Maryland. Vals-par opted out of that class and the remaining defendant suppliers' settled the case after they were denied summary judgment. See In re Titanium Dioxide Antitrust Litig., 959 F,Supp.2d 799, 832 (D. Md. 2013). Valspar then filed its' own claim in the United States District Court for the District of Minnesota, which was subsequently severed. Valspar settled all claims except this one against DuPont, which was transferred to the United States District Court for the District of Delaware, where DuPont moved for summary judgment. Although presented with “substantially the same record ... as in the Maryland Class Action,” the District Court reached a “different conclusion.” Valspar Corp. v. E.I. Du Pont De Nemours, 152 F.Supp.3d 234, 252 (D. Del. 2016). Reviewing the record and our Court’s precedents, the District Court found that “evidence of an actual agreement to fix prices” was “lacking.” Id. at 253. Reasoning that such evidence is necessary for a plaintiff to survive summary judgment, the District Court granted DuPont’s motion. Id. III The District Court had jurisdiction under 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291. Our standard of review is intertwined with substantive antitrust law and the parties dispute its contours. We therefore begin by reviewing the applicable law. A Section' 1 of the Sherman Act prohibits “[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade.” 15 U.S.C. § 1. Unlike § 2- of the Sherman Act, which addresses monopolization and other illegal unilateral conduct, § 1 applies only when there is an agreement to restrain trade; so a single firm’s independent action, no matter how anticompetitive its aim, does not implicate § 1. Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). While some offenses under § 1 are reviewed’for reasonableness, Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 885-86, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007), others have no possible competitive virtue and are therefore per se illegal; Broad. Music, Inc. v. Columbia Broad. Sys., Inc., 441 U.S. 1, 19-20, 99 S.Ct. 1551 (1979). Horizontal price fixing (ie., price fixing among competitors) is one such per se violation because it is a “threat to the central nervous system of the economy.” United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 224 n.59, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Oligopolies pose a special problem under § 1 because rational, independent actions taken by oligopolists can be nearly indistinguishable from horizontal price fixing. This problem is the result of “interdependence,” which occurs because “any rational decision [in an oligopoly] must take into account the anticipated reaction of the other firms.” In re Flat Glass Antitrust Litig., 385 F.3d 350, 359 (3d Cir. 2004) (alteration omitted) (quoting Philip E. Areeda & Herbert Hovenkamp, Antitrust Law 207 (2d. ed. 2000)). In a market with many firms, “the effects of any .single firm’s price ánd output decisions ‘would be so diffused among its numerous competitors that they would not be aware of any change.’” Id. (quoting Areeda & Hovenkamp, supra, at 206). The opposite is true in an oligopoly, where any price movement “will have a noticeable impact on the market and on its rivals.” Id. (quoting Areeda & Hovenkamp, supra, at 206); see also In re Text Messaging Antitrust Litig., 782 F.3d 867, 875 (7th Cir. 2015) (oligopolists “watch each other like hawks”). This “oligopolistic rationality” can cause supracompetitive prices because it discourages price reductions while encouraging price increases. A firm is unlikely to lower its price in an effort to win market share because its competitors will quickly learn of that reduction and match it, causing the first mover’s profits to decline and a subsequent decline in the overall profits of the industry. Flat Glass, 385 F.3d at 359. Similarly, if a firm announces a price increase, other market participants will know that “if they do not. increase their prices to [the first-mover’s] level, [the first-mover] may be forced to reduce its price to their level. Because each of the other firms know this, each will consider whether it is better off when all are charging the old price or [the new one]. They will obviously choose [the new price] when they believe that it will maximize industry profits.” Id. (quoting Areeda & Hovenkamp, supra, at 207-08). . The Supreme Court has explained that this behavior does not violate antitrust laws. See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). Even though such interdependence or “conscious parallelism” harms consumers just - as a monopoly does, it is beyond the reach of antitrust laws for two reasons. First, some courts and scholars theorize “that interdependent behavior is not an ‘agreement’ within the term’s meaning under the Sherman Act;” Flat Glass, 385 F.3d at 360 (citing Donald F. Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv. L. Rev. 655, 663-65 (1962)). And second, “it is’ close to impossible to devise a judicially enforceable remedy for ‘interdependent’ pricing.” Clamp-All Corp. v. Cast Iron Soil Pipe Inst., 851 F.2d 478, 484 (1st Cir. 1988) (Breyer, J.). The problem is this: “How does one order a firm to set its prices without regard to the likely reactions of its competitors?” Id. B “When faced with whether a plaintiff has offered sufficient proof of an agreement to preclude summary judgment, a court must generally apply the same summary judgment standards that apply in other contexts.” Flat Glass, 385 F.3d at 357. Accordingly, a court will enter summary judgment when the evidence shows “no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed. R. Civ. P. 56(a). As in other summary judgment contexts, we “review the record as a whole and in the light most favorable to the nonmovant, drawing reasonable inferences in its favor.” In re Chocolate Confectionary Antitrust Litig., 801 F.3d 383, 396 (3d Cir. 2015). However, we have recognized there is “an important distinction” to this general standard in antitrust cases. Flat Glass, 385 F.3d at 357. “[AJntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case.” Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Specifically, “conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.” Id.[1] The reason for this more rigorous standard is that mistaken inferences are especially costly in antitrust cases, since they could penalize desirable competitive behavior and “chill the very conduct the antitrust laws are designed to protect.” Id. at 594, 106 S.Ct. 1348.[2] With those principles informing our analysis, this Court has developed specialized evidentiary standards at summary judgment in antitrust cases in general and in oligopoly cases in particular. Our analysis often begins with evidence of parallel price movements. See Chocolate, 801 F.3d at 397. In non-oligopolistic markets, “[p]ar-allel behavior among competitors is especially probative of price fixing because it is the sine qua non of a price fixing conspiracy.” Southway Theatres, Inc. v. Ga. Theatre Co., 672 F.2d 485, 501 (5th Cir. Unit B 1982). But in an oligopolistic market, parallel behavior “can be a necessary fact of life,” In re Baby Food Antitrust Litig., 166 F.3d 112, 122 (3d Cir. 1999), and “[accordingly, evidence of conscious parallelism cannot alone create a reasonable inference of a conspiracy,” Chocolate, 801 F.3d at 398. Therefore, to prove an oligopolistic conspiracy with proof of parallel behavior, that evidence “must go beyond mere interdependence” and “be so unusual that in the absence of an advance agreement, no reasonable firm would have engaged in it.” Baby Food, 166 F.3d at 135. Because proof of parallel behavior will rarely itself create an inference of conspiracy, a plaintiff will often need to “show that certain plus factors are present” in order “[t]o move the ball across the goal line.” Chocolate, 801 F.3d at 398-99. “Plus factors are proxies for direct evidence because they tend to ensure that courts punish concerted action—an actual agreement.” Id. (internal formatting and citations omitted). “Although we have not identified an exhaustive list of plus factors, they may include (1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy.” Id. at 398. While normally all three plus factors are weighed together, in the case of oligopolies the first two factors are deemphasized because they “largely restate the phenomenon of interdependence.” Flat Glass, 385 F.3d at 360. Put another way, “[ejvidence of a motive to conspire means the market is conducive to price fixing, and evidence of actions against self-interest means there is evidence of behavior inconsistent with a competitive market.” Chocolate, 801 F.3d at 398. Since those qualities are intrinsic to oligopolies, we instead focus on the third plus factor: “evidence implying a traditional conspiracy.” Flat Glass, 385 F.3d at 360 (citation omitted). To meet this factor, we require “proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown.” Id. at 361 (citations omitted).[3] After evaluating the evidence through our plus factor analysis,- we then assess whether, “[considering the evidence as a whole,” it is “more likely than not [that the • defendants] conspired to fix prices.” Chocolate, 801 F.3d at 412.[4] This Court has at times employed different approaches for sifting through the proffered evidence. Compare Flat Glass, 385 F.3d at 363-69 (summarizing all of plaintiffs evidence without editorializing, and then performing an “Analytical Summary” to decide whether the body of evidence made conspiracy more likely than not), with Chocolate, 801 F.3d at 403-12 (looking at individual groupings of evidence to see whether any “supported an inference of conspiracy,” id. at 408, and then taking a holistic view of the evidence in context and determining that “it does not tend to exclude the possibility.that [defendants] acted lawfully,” id. at 412). Whatever method is used, the bottom line is that “a plaintiff relying on ambiguous evidence alone cannot raise a reasonable inference of a conspiracy sufficient to survive summary judgment,” Chocolate, 801 F.3d at 396, but—like in all other, summary judgment cases—that evidence must be viewed in the context of all other evidence, Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1364-65 (3d Cir. 1992). IV We now turn to the evidence of record, which we will evaluate in light of the principles just outlined. We first consider the parallel pricing evidence, then move to evidence under the plus factors, and finally consider the record in toto. 1 Valspar .bases its case, primarily on the 31 parallel price increase, announcements issued by the competitors during the alleged conspiracy, arguing that it is “inconceivable” that, on 31 occasions, the competitors “conducted] independent analyses ... [and] nearly simultaneously arrived at identical price increase amounts to be implemented on exactly the same day.” Valspar Br, 37. Valspar’s argument fails for two reasons. First, its characterization of the suppliers’ price announcements neglects the theory of conscious parallelism and flies in the face of our doctrine that in an oligopoly “any rational decision must take into account the anticipated reaction of the other ... firms.” Baby Food, 166 F.3d at 122 (emphasis added) (citations omitted).[5] Thus, DuPont does not claim that the competitors’ numerous parallel price increases were discrete events—nor could it do so with a straight face. But it doesn’t need to. The theory of interdependence recognizes that price movement in an oligopoly will be just that: interdependent. And that phenomenon frequently will lead to successive price increases, because oligopolists may “conclude that the industry as a whole would be better off by raising prices.” Chocolate, 801 F.3d at 397.[6] Second, Valspar does not engage this Court’s' demanding rule that in order to raise an inference of conspiracy on this point, it was required to show that the suppliers’ parallel pricing went “beyond mere interdependence [and was] So unusual that in the absence of advance agreement, no reasonable firm would have engaged in it.” Baby Food, 166 F.3d at 135. Valspar never cites this important controlling precedent, nor does it attempt to show how it might be met. Apart from Valspar’s failure to carry its burden, DuPont demonstrates that “market realities -... clearly controvert [Vals-par’s] contention” that these announcements are evidence of a conspiracy. Id. at 131. First, supply contracts in the titanium dioxide industry contained price-protection clauses requiring a notice period to customers before a price increase, meaning that if a supplier failed to match a" competitor’s announcement, it was foregoing the possibility of negotiating a price increase during that period. These industry-wide contractual provisions made the benefit of matching a price increase announcement high and the risk minimal: if a competitor later undercut that price in an effort to take market share, the supplier could refrain from implementing the price increase or even respond by lowering its price. Second, DuPont demonstrated that the market for titanium dioxide remained competitive despite the frequent price increase announcements. Indeed, Valspar employees testified that it was “very common” to negotiate away a supplier’s attempt to increase price, DuPont Br. 6, and said that “[o]ften ... an aggressive supplier would be interested in achieving more volume and would come in and offer a [lower] price,” id. at 9. Across all suppliers’ attempted price increases, Valspar was able to avoid that increase (or even negotiate a decrease) one-third of the time. Thus, Valspar’s characterization of this evidence is controverted by market realities; “aggressive” and “common” price competition between firms is inconsistent with the idea that those same firms have conspired not to compete on price.[7] 2 Valspar also advances the related argument that the flurry of price announcements reflects a drastic change from pre-conspiracy behavior in the titanium dioxide market. A change in industry practices must be “radical” or “abrupt” to “create an inference of a conspiracy.” Chocolate, 801 F.3d at 410 (citation omitted). Valspar claims to have met this standard because there were only three parallel price increase announcements before the alleged conspiracy period (as compared to the thirty-one during the conspiracy period). We disagree. In Chocolate, the plaintiffs advanced a similar argument, relying on an increased frequency in parallel pricing activity from pre-conspiracy behavior. There, we explained that “the focus of the Piaintiffs’ argument is unduly narrow” because “[historically, parallel pricing in the U.S. chocolate market has not been at all uncommon.” Chocolate, 801 F.3d at 410. Here too, public parallel price increase announcements are “consistent with how this industry has historically operated.” Valspar, 152 F.Supp.3d at 252 (quoting Chocolate, 801 F.3d at 410). Similarly, when other courts have found a radical or abrupt change to indicate conspiracy, that change has generally been more than just an uptick in frequency of a pre-established industry practice. See Toys “R” Us, Inc. v. FTC, 221 F.3d 928, 935 (7th Cir. 2000) (group of toy distributors unanimously stopped dealing with warehouse clubs after years of that being an industry norm). That logic rings particularly true in this context because “it is generally unremarkable for the pendulum in oligopolistic markets to swing from less to more interdependent and cooperative.” Chocolate, 801 F.3d at 410 (citing Areeda & Hovenkamp, supra, at 229). B Having found that the pattern of parallel price increases does not raise an inference of conspiracy, we next turn to Valspar’s argument that the plus factors evidence a conspiracy. As explained above, this Court has developed a specialized rule that in oligopolistic markets, “ ‘the first two factors largely restate the phenomenon of interdependence,’ ... [which] leaves traditional non-economic evidence of a conspiracy as the most important plus factor.” Chocolate, 801 F.3d at 398 (citation omitted). Tellingly, Valspar ignores this important point and instead emphasizes why the first two plus factors are met. Valspar’s “victory ... is a hollow one,” however, having succeeded in showing interdependence but not conspiracy. Id. at 400. 1 The first factor relates to motive to enter a conspiracy, i.e., that “the market is conducive to price fixing.” Id. at 398. There is little doubt that this highly concentrated market for a commodity-like product with no viable substitutes and substantial barriers to entry was conducive to price fixing. The second plus factor looks for evidence of action against self-interest, ie., “evidence that the market behaved in a noncompetitive manner.” Flat Glass, 385 F.3d at 361 (citation omitted). Valspar presents evidence that there was “a 16% overcharge” and that “price increases were not correlated to supply-and-demand principles.” Valspar Br. 57. While true, this is largely irrelevant because it ignores the fact that “firms in a concentrated market may maintain their prices at supracompeti-tive levels, or even raise them to those levels, without engaging in any overt concerted action.” Flat Glass, 385 F.3d at 359.[8] Most of Valspar’s other economic expert evidence addresses the first two plus factors as well. See Flat Glass, 385 F.3d at 361 (explaining that the third plus factor is where “non-eeonomic evidence” should be considered (emphasis added)). For example, Valspar notes that its expert “concluded there was economic evidence of ability to enforce their price-fixing agreement,” and “found from an economic point of view the markets were relatively stable.” Vals-par Br. 41, 43. From findings like these, Valspar argues that “the district’ court should have accepted [the expert’s] economic conclusions” that the competitors could not have acted independently. Vals-par Br. 42. This gets things backwards. There is no dispute that the market was primed for anticompetitive interdependence and that it operated in that manner. Valspar’s expert evidence confirming these facts mastered the obvious.[9] 2 We finally reach Valspar’s evidence under our third plus factor: traditional conspiracy evidence, where we look for “proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown.”[10] Flat Glass, 385 F.3d at 361 (citation omitted). We approach the third plus factor as this Court did in -Chocolate, first considering individual groups of evidence to see whether any raise an inference of conspiracy, before evaluating all of the proof in com text. See 801 F.3d at 403-12. Here, we agree with the District Court that Valspar failed to raise an inference of conspiracy. Each strand of evidence is weaker than similar evidence in cases where this Court has affirmed summary judgment in favor of companies that operate in an oligopolistic market. First, Valspar shows that DuPont and the other competitors took part in a data sharing program offered by the Titanium Dioxide Manufacturers Association. As part of this program (the Global Statistics Program, or GSP) the competitors provided production, inventory, and sales-volume data (but never price data) to the TDMA, which then aggregated, anonym-ized, and redistributed the data. Without citing any precedent to show why this type of information sharing was illegal, Valspar argues that the GSP allowed each conspirator to calculate its own market share and thus deduce whether it was, getting, its fair share of the conspiracy’s profits.. This argument suffers from the loaded question fallacy. Instead of setting out to prove: “Does the GSP show that a conspiracy existed?,” Valspar attempts to answer: “How did the GSP further the conspiracy?” This approach cannot satisfy Valspar’s burden. “[A] litigant may not proceed by first assuming a conspiracy and- then explaining the evidence accordingly.” Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, 203 F.3d 1028, 1033 (8th Cir. 2000). Moreover, our prior decisions undermine Valspar’s argument that the GSP supports an inference of conspiracy For example, in Baby Food, we affirmed summary judgment despite the fact that the alleged conspirators’ sales representatives had “exchanged] pricing information,” explaining that there was no evidence these exchanges had any effect over the companies’ final pricing decisions, 166 F.3d at 117, and observing,1 in any event, that “[t]he exchange of price data ... can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive.” Id. at 125 (quoting United States v. U.S. Gypsum Co., 438 U.S. 422, 443 n.16, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978)). And in Flat Glass, the alleged conspirators each provided price data to a business that would use those inputs to set recommended prices for the industry. 385 F.3d at 355. The alleged conspirators knew how the recommended prices were calculated, so “were able to calculate backwards” and determine the price inputs used. Id. at 370. We explained that although this would rightfully “raise suspicion,” the “publication of pricing information can have a pro-comp¿t-itive, effect” and, with little other evidence supporting the inference of a conspiracy, affirmed summary judgment oh that claim. Id. The data exchanged as part of the GSP looks innocuous when compared to the information in Baby Food and Flat Glass. The GSP aggregated and blinded “members’ monthly sales, production, and inventory data worldwide,” but never collected price information. Valspar Br. 47. Valspar argues that “the co-conspirators partially disaggregated the data to track individual firms.” -Valspar Br. 48. But as the District Court noted, “the evidence provided by Valspar does not support this conclusion” and Valspar’s own expert conceded that the GSP merely allowed each firm to calculate its own market share. Valspar, 152 F.Supp.3d at 245-46.[11] Belatedly, Valspar claims that the alleged conspirators “used the TDMA meetings to communicate their pricing plans, coordinate price increases, and confirm that each competitor would follow the leader on price increases.” Valspar Br. 50. Valspar’s argument essentially begins and ends with opportunity: the TDMA meetings brought the competitors together, so one should assume that they used the meetings to conspire. But as the District Court noted, “[t]here is no evidence that there was any discussion of prices during these meetings and certainly no evidence of an agreement.” Valspar, 152 F.Supp.3d at 246. Consequently, Valspar’s argument falls short under our precedents. Chocolate, 801 F.3d at 409 (“[E]vidence ... that the executives from the [alleged conspirators] were in the samé place at the same time ... is insufficient to support a reasonable inference of concerted activity.”); Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., 998 F.2d 1224, 1235 (3d Cir. 1993) (“Proof of opportunity to conspire, without more, will not sustain an inference that a conspiracy-has taken place.” (citation omitted)). Next, Valspar suggests that the competitors used industry’consultants as conduits to funnel information. For example, Valspar points to an e-mail from a Kronos employee to a consultant noting that the employee had heard rumors of an impending Huntsman price increase, but thought it “sound[ed] weird” and wanted to know if the consultant could “confirm anything from [his] lofty position.” Valspar Br. 20. This sort of inquiry to a consultant is not probative of conspiracy. We have explained that “it makes common sense to obtain as much information as possible of the pricing policies and marketing strategies of one!s competitors.” Baby Food, 166 F.3d at 126. In fact, this type of inquiry undermines the existence of a conspiracy because conspirators would have no need to ask consultants about the specifics of their own conspiracy. See Mayor & City Council of Balt., Md. v. Citigroup, Inc., 709 F.3d 129, 139 (2d Cir. 2013) (attempts to confirm future pricing plans of competitors “tend to suggest the absence ■ of- ■ [competitor] communications” because if competitors were' communicating directly they “would not have had to rely on third parties to confirm [each other’s] strategies]”). Valspar also- emphasizes a selection of internal e-mails sent by the various competitors. For example, a DuPont e-mail advocated for a price modification “[o]nly if you are not undercutting- a Kronos price increase!” Valspar Br. 9. A Millennium email said: “We should' have. this extra [market] share—customers have been and want to buy this from us. Competitors will let us have this.” Id. at 8. And a Cristal email stated that “all major global players have been very disciplined with pricing implementation up to this point.” Id. at 10. These e-mails are helpful to Vals-par, but only superficially. They may raise some suspicion insofar as they indicate that something anticompetitive is afoot. But as we have explained, oligopolistic conscious parallelism is by nature anticompet-itive and also legal. See Chocolate, 801 F.3d at 397. Essentially, these e-mails show that the competitors were aware of the phenomenon of conscious parallelism and implemented pricing strategies in response to it. It makes sense that each firm would implement such strategies, since conscious parallelism allows firms in an oligopoly to “in effect share monopoly power” and maintain “prices at a profit-maximizing, supracompetitive level.” Brooke Group, 509 U.S. at 227, 113 S.Ct. 2578. To forbid firms in an oligopoly from considering conscious parallelism in its internal pricing decisions would be to require a firm to do the impossible: “set its prices without regard to the likely reactions of its competitors.” Clamp-All Corp., 851 F.2d at 484 (Breyer, J.). This logic explains away most of Vals-par’s concerns. For example, DuPont would not want to undercut a Kronos price increase, because doing so would result in Kronos lowering its price and a concomitant decrease in profits for everyone. See Flat Glass, 385 F.3d at 359. Moreover, these same e-mails show that the competitors engaged in independent and contemporaneous internal deliberations. For example, a DuPont employee wrote: “From a testing perspective, it may be valuable to make the October announcement. If our competitors do follow, it sends a clear message to us that they are receiving/understanding our price increase messages ... If they don’t, we would also learn how well we’ve trained them.” Valspar Br. 17 (emphases added).[12] And a Kronos employee wrote that it “hope[dJ that Du[P]ont is smart enough not to undo what we have all done in the Ti02 market by keeping some sort of discipline.” Id. at 10 (first alteration in original) (emphasis added). We have explained that documents showing this type of internal deliberation may negate an inference of conspiracy. Baby Food, 166 F.3d at 131 (rejecting plaintiffs interpretation of a set of documents because “[contemporaneous documents also show that [an alleged conspirator] made independent pricing decisions.”); Text Messaging, 782 F.3d at 873 (noting that nothing in the allegedly collusive e-mails “suggests that [the defendants] believed there was a conspiracy among the carriers”).[13] Finally, Valspar highlights a handful of inter-competitor sales at below market prices, arguing that those sales were used to redistribute gains and losses to maintain the alleged conspiracy. But looking to the specific facts present here, the District Court found that the sales were “just as consistent with non-collusive activity as with conspiracy.” Valspar, 152 F.Supp.3d at 244. First, Valspar’s expert conceded that the sales were at such low volumes that they would not have resulted in large shifts of market share, thus largely defeating Valspar’s theory of profit redistribution. Second; Hurricane Katrina knocked out one of DuPont’s titanium dioxide plants so it was unable to meet all its internal demand for the product, requiring DuPont to purchase it from other firms. Importantly, these sales occurred at prices sometimes higher and sometimes lower than the average prices for non-defendants. And third, a number of these sales were made by DuPont to Kronos pursuant to a cross-licensing agreement in order to avoid patent litigation. After this licensing agreement ended, DuPont successfully negotiated a price increase. Valspar does not seriously dispute these explanations, but instead argues “[i]f one seller buys anything from another at non-market prices, then a resource transfer is made for which there is no reasonable, noncollusive explanation.” Reply Br. 21 (quoting Wiliam E. Kovacic et -al., Plus Factors and Agreement in Antitrust Law, 110 Mich. L. Rev. 393, 423 (2011)). Valspar offers no case support for this proposition, but instead puts all its eggs in the basket of a single law review article. See id. But that law review article: (a) spends only one paragraph on this theory; (b) cites no precedent or economic studies to support it; (c) recognizes that patent licensing and cross licensing can be legitimate; and (d) seems to limit its analysis to “interfirm transfers of resources that are largely void of productive unilateral motivations.” Kovacic, supra, at 423. In the face of DuPont’s reasonable explanations to the contrary, we decline to give this isolated quotation the force of law. 3 Having considered each piece of evidence individually and decided that none raises an inference of conspiracy, , we must now consider the evidence as a whole.[14] See Chocolate, 801 F.3d at 412. To summarize, granting all legitimate inferences to Valspar, it presented evidence of: parallel price movement, internal e-mails showing an awareness of this parallel price movement, competitor participation in a trade association and statistics sharing program, inter-firm sales at below market prices, and use of industry consultants. In assessing this evidence, we look to this Court’s-three.1'cases examining, alleged oli-gopolistic conspiracies at summary judgment:- Chocolate and Baby Food, where summary judgment was granted, and Flat Glass, where summary, judgment was partially denied. First, Valspar did riot offer any single form of evidence that would have gotten it close to showing that a conspiracy is more likely than not. Valspar emphasizes the pattern of parallel price announcements, but for the reasons explained, we don’t find them particularly persuasive. See supra Section IV-A-1, 2. By comparison, in Chocolate and Baby Food, where summary judgment was granted in favor of the alleged conspirators, the plaintiffs’ cases were supported with far stronger lead evidence than present here. For example, the Chocolate plaintiffs established that the very same defendants had been part of a contemporaneous price-fixing conspiracy in Canada—to which one of the defendants had already pleaded guilty to the Canadian authorities. 801 F.3d at 393, 402. In Baby Food, the defendants had advance knowledge of each other’s planned price increases- (or decisions not to raise prices) on several occasions. 166 F.3d at 119-20. And this pales in comparison to Flat Glass— our one case in which defendant’s motion for summary judgment was denied—where one of the defendant’s -alleged co-conspirators confessed to “an agreed upon, across the board price increase for the entire United States” to the Department of Justice in an attempt to gain leniency. 385 F.3d at 363 (citation omitted). Just as Valspar’s lead evidence is weaker than that in our relevant cases, so too is its supporting evidence. For example, although Valspar alleges that the competitors may have swapped certain price infor-matiori through the TDMA or consultants, there is no evidence that price information was ever voluntarily exchanged, and the information that allegedly was exchanged through these sources pales in comparison to what was shared in cases where we affirmed summary • judgment to defendants. See supra Section IV-B-2. Likewise, the internal e-mails uncovered by Valspar look harmless next to those in our caselaw. First, all of the e-mails uncovered by Vals-par were internal to each competitor, whereas- in Baby Food there was regular communication between competitors. 166 F.3d at 119-20. Moreover, there is nothing in the competitors’ e-mails to indicate that their pricing behavior was the result of an actual agreement (as opposed to conscious parallelism), unlike in Baby Food, 166 F.3d at 120 (referring to the - competitors’ “truce”). And again, these e-mails, do not approach those from Flat Glass, where one conspirator wrote that it was “monitoring the market to make sure that all stick to the rules” and admitted that one of the conspirators “assured me that they were fully supportive of the price increase proposition.” 385 F.3d at 366-67 (citations omitted). In sum, after reviewing the record as a whole, we conclude that the District Court did not err when it held that Valspar’s evidence did not meet our standard to survive summary judgment. o One final point deserves mention. Vals-par makes much of thfe District of Maryland litigation where summary judgment was denied on a materially similar record. It argues that “principles of comity and the doctrine of stare decisis should have given the Delaware court greater pause before reaching a decision in conflict with the Maryland Action.*’ Valspar Br. 61. Valspar’s argument has an obvious flaw: the District of Maryland sits within the United States Court of Appeals for the Fourth Circuit. See 28 U.S.C. § 41. Thus, the Maryland District Court, had no obligation to consider Third Circuit precedent, but the District Court in this case was bound by it. This resulted in the Maryland court applying a standard quite different from, the one we have developed and that the District Court applied. Compare Valspar, 152 F.Supp.3d at 240 ,(“A plaintiff relying on ambiguous evidence alone cannot raise a reasonable inference of conspiracy sufficient to survive summary judgment.” (quoting Chocolate, 801 F.3d at 396-97)), with Titanium Dioxide, 959 F.Supp.2d at 824 (“[W]here ‘a plaintiff relies on ambiguous evidence to prove its claim, the existence of a conspiracy must be a reasonable inference that the jury could draw from that evidence.’ ” (citing In re Publ’n Paper Antitrust Litig., 690 F.3d 51, 63 (2d Cir. 2012))). In light of Third Circuit precedent applying § 1 of the Sherman Act to oligopolies, the, District Court did not err.[15] * * * For the reasons stated, we will affirm the judgment of the District Court. . As Valspar and our dissenting colleague point out, Matsushita involved an alleged conspiracy that did not make "economic sense,” 475 U.S. at 587, 106 S.Ct. 1348, and the Court declined to draw liberal inferences because the defendants "had no rational economic motive to conspire,” id. at 596, 106 S.Ct. 1348. While these unlikely-to-succeed conspiracies provide one good reason to be circumspect in our inferences, we have explained that oligopolistic interdependence provides another good reason for inferential modesty. See Flat Glass, 385 F.3d at 358 ("[DJespite the absence of the Matsushita Court's concerns, this Court and others have been cautious in accepting inferences from circumstantial evidence in cases involving allegations of horizontal price-fixing among oli-gopolists.” (emphasis added)); Chocolate, 801 F.3d at 397 (explaining that "despite the facial plausibility of the Plaintiffs theory and the circumstantial evidence supporting it, we must be cautious. ... [since] the U.S. chocolate market is a textbook example of an oligopoly and we cannot infer too much from mere evidence of parallel pricing among oligopol-ists” (citation omitted)). While the dissent's interpretation of Mat-sushita is reasonable, it is contrary to Third Circuit jurisprudence. In Chocolate, we held that a plaintiff in an oligopoly case must provide inferences that show that the alleged conspiracy is "more likely than not.” 801 F.3d at 412. And in Flat Glass, we considered and rejected the dissent’s more limited reading of Matsushita by acknowledging that some scholars think our extension of Matsushita is "an unfortunate misinterpretation” of that case while nonetheless continuing our "circumspect approach.” 385 F.3d at 359 & n.9 (citation omitted). . If a plaintiff provides direct evidence, then the "strictures of Matsushita [do] not apply,” Petruzzi’s IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1233 (3d Cir. 1993). That is because "no inferences are required from direct evidence to establish a fact and thus a court need not be concerned about the reasonableness of the inferences to be drawn from such evidence.” Id. Valspar’s appeal does not involve direct evidence of conspiracy, and such evidence is rare in price-fixing cases. See In re Plywood Antitrust Litig., 655 F.2d 627, 633 (5th Cir. 1981) ("[S]olemnized covenants to conspire are difficult to come by in any price fixing case.”). . Valspar seems to argue that proof of a tacit agreement among the suppliers—that is, an awareness that they were engaging in conscious parallelism—should suffice to meet this factor. We disagree. While tacit agreements remain illegal under § 1, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 553, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the third plus factor requires evidence implying traditional (i.e., explicit) conspiracy. See Flat Glass, 385 F.3d at 361 (requiring proof of an "actual, manifest agreement not to compete” (citation omitted)). As a practical matter, tacit conspiracy and conscious parallelism are difficult to differentiate, if such differentiation is possible at all. See Andrew Gavil, Antitrust Law in Perspective: Cases, Concepts, and Problems in Competition Policy 311 (2d ed. 2008) ("(The] boundary between tacit agreements—to which Section 1 applies—and parallel pricing stemming from oligopolistic interdependence” is not clear.); George A. Hay, Horizontal Agreements: Concept and Proof, 51 Antitrust Bull. 877, 894-95 & n.46 (2006) (theorizing how to distinguish between á tacit agreement and oligopolistic interdependence—"[i]f that can be done”—while noting that the distinctions might totally be lost on a jury). We have tried to eradicate this confusion by placing emphasis on the third plus factor and requiring "traditional conspiracy” evidence. See Flat Glass, 385 F.3d at 360-61, In other words, we realized that the type of evidence that might prove a "tacit” conspiracy (e.g., motive, actions against self-interest, parallel behavior, etc., Interstate Circuit v. United States, 306 U.S. 208, 225-28, 59 S.Ct. 467, 83 L.Ed. 610 (1939)) in the context of oligopolies can be unhelpfully equivocal,..and thus decided to focus on evidence generally required to show an explicit, manifest agreement. Moreover, the sort of proof that would generally count towards- proving a tacit conspiracy is largely accounted for in different parts of our oligopoly summary judgment framework. See Baby Food, 166 F.3d at 121-23, 130 (considering parallel pricing before the plus factors); Flat Glass, 385 F.3d at 360 (considering actions against self-interest and motive as part of first two plus factors). Although we do not rule out the possibility that evidence of a tacit agreement could suffice to meet this factor when a plaintiff also offers non-economic evidence of a traditional conspiracy—for exampié, when Company A proposes a parallel price increase to Company B, and Company B does not explicitly agree but then follows suit when Company A raises its prices, see Interstate, 306 U.S. at 222, 59 S.Ct. 467—economic evidence alone cannot demonstrate a tacit agreement under our oligopoly cases. . While the dissent wonders what it will "now take for a plaintiff relying on. circumstantial evidence to move the ball across the goal line,” Dissent at 205, the above precedents already resolve that question. Namely, the plaintiff's inferences must show that conspiracy is "more likely than not.” Chocolate, 801 F.3d at 412. That may be a high bar—but it is the bar established by this Court and binding ■on this panel. . Indeed, this same mistake pervades Vals-par’s argument. As the District Court aptly explained, Valspar generally "neglects the theory of interdependence.” Valspar, 152 F.Supp.3d at 248. For example, despite the central role "conscious parallelism” and "interdependence” play in opr oligopoly caselaw, each of those phrases. appear qnly once in Valspar’s opening brief. . Valspar also notes that the suppliers' executives denied engaging in "follow the leader pricing.” Valspar Br. 15. Essentially, Valspar is arguing that we should infer a conspiracy from this potential pretext. That argument fails under our caselaw because "pretextual reasons are insufficient to create a genuine issue of fact without other evidence pointing to a price-fixing agreement.” Chocolate, 801 F.3d at 411 (alterations omitted) (quoting Miles Distribs. v. Specialty Constr. Brands, Inc., 476 F.3d 442, 452 (7th Cir. 2007)). . Thus, the circumstances here are different than those in Flat Glass, where we stated that "[a]n agreement to fix prices is a per se violation of the Sherman Act even if most or for that matter all transactions occurred at lower [than list] prices.” 385 F.3d at 362 (citation and alteration omitted). Here, we find significant not just that actual prices occurred below announced prices, but that actúal prices occurred below announced prices because alleged conspirators frequently undercut other members of the alleged conspiracy. We are mindful that a "failed attempt to fix prices” is illegal, id. at 363, but it is likewise significant that the alleged conspirators behaved contrary to the existence of a conspiracy- . Although the first two plus factors may, at times, "do more than restate economic interdependence,” Flat Glass, 385 F.3d at 361 n.12, Valspar has not shown that they do so here. For example, despite the dissent’s insistence to the contrary, there is no evidence of record showing "unilateral exchanges of confidential price information,” which is one example of an action against self-interest that may not simply be a result of interdependence. See Dissent at 207 (quoting Flat Glass, 385 F.3d at 361 n.12); see also infra Part IVB-2 (discussing the information exchanges shown to have occurred between the suppliers). . In addition, Valspar would have us give the expert’s conclusion an outsized role in the summary judgment analysis. While we have explained that a district court should not "im-permissibly weigh[ ]” expert evidence by picking out "potential flaws,” Petruzzi's, 998 F.2d at 1241, that does not mean that a district court is obligated to accept an expert's legal conclusions, Dalberth v. Xerox Corp., 766 F.3d 172, 189 (2d Cir. 2014). Although Valspar's expert, Dr. Williams, concluded that its evidence excludes the inference that the competitors acted independently, that conclusion was based on predicates that are insufficient under our caselaw. For example, Dr. Williams took the type of evidence that we have said is of diminished value in the oligopoly context (i.e., parallel price movement and evidence best considered under the first two plus factors) and from there concluded that the suppliers had illegally conspired. The District Court was correct to reject this line of argument and note that the evidence from which the expert based his conclusions is “not necessarily ... evidence of an agreement” under our oligopoly caselaw. Valspar, 152 F.Supp.3d at 243. . The dissent claims that we ignore this precedent and "required[ ] Valspar to present evidence of direct meetings and conversations,” Dissent at 205. Not so. There is no doubt that a plaintiff can satisfy this plus factor with circumstantial evidence, but that circumstantial evidence must indicate the existence of an ''actual, manifest agreement not to compete.” Flat Glass, 385 F.3d at 361 (citation omitted), While Valspar marshals 'circumstantial evidence of anticompetitive behavior, the record does not show the existence of an actual agreement, . Additionally, the GSP most resembled a data collection program blessed by the Ninth Circuit in In re Citric Acid Litigation, where a centralized trade association, "collected figures on production’and sales from each of its members, audited this information on an annual basis, and produced statistics aggregated by country on citric acid production and sales." 191 F.3d 1090, 1098 (9th Cir. 1999). That court called the program "wholly legal” and explained that it was “uncontested that these activities served the legitimate purpose of informing members of [market] conditions." Id. . Although Valspar and the dissent contend that the competitors implemented their conspiracy through public announcements of their price increases, these e-mails reflect that, even if such "signalling” occurred, it was not in furtherance of any prior agreement. Had the competitors "got[ten] together and exchanged assurances of common action or otherwise adopted a common plan,” Flat Glass, 385 F.3d at 361, there would have been no need for DuPont to resort to public announcements to "test” whether its competitors were "receiving/understanding [its] price increase messages.” See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1310 (11th Cir. 2003) (refusing to infer a conspiracy from signalling among oligopolists absent evidence that it was in furtherance of an agreement); Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, 203 F.3d 1028, 1037 (8th Cir. 2000) (same). . The dissent reads these e-mails differently, arguing that they show the competitors (1) often “would not undercut one another’s prices [ (2) ] and that they were involved in an organization (i.e., cartel) controlling prices.” Dissent at 208 (emphasis added) (citation omitted). We agree with the first proposition, but that is a natural consequence of oligopo-listic interdependence. See Flat Glass, 385 F.3d at 359. As for the second proposition, we do not see enough evidence in the record to support it. While the internal e-mails indicate that the suppliers knew their pricing decisions may be consciously parallel and that their collective interests would at times be aligned, the e-mails do not evidence an explicit agreement to fix prices—and often show that such an agreement was lacking. . Our dissenting colleague claims that, in the foregoing section, we went through "each individual piece of evidence and disregarded] it if we could feasibly interpret it as consistent with the absence of an agreement to raise prices.” Dissent at 212 (citation omitted). That misunderstands our mode of analysis. For the sake of Coherence, we presented and discussed each piece of evidence separately, and found that no single piece on its own, made a conspiracy more likely than not. (After all, if á single piece of evidence made conspiracy more likely- than not, Valspar would survive summary judgment and our task would end.) We now consider the evidence together to determine whether the entire body of evidence—viewed in context—tips the scale in Valspar's favor. . Contrary to Valspar’s contention; our case-law does not foreclose the possibility that a plaintiff can defeat summary judgment with only circumstantial evidence in the Section 1 oligopoly context. That circumstantial evidence, however, must be non-economic evi-' dence of an actual agreement between the conspirators, and not just a restatement of the interdependent economic conduct that we must accept in an oligopolistic marketplace. See Petruzzi’s, 998 F.2d at 1242 (“mere consciously parallel behavior alone is insufficient to prove a conspiracy, [but] it is circumstantial evidence from which, when supplemented by additional evidence, an illegal agreement can be inferred." (emphasis added)). As explained above, Valspar has not provided circumstantial non-economic evidence sufficient to support the inference of a conspiracy,